64 Wn.2d 150 (1964)
390 P.2d 970
WASHINGTON RESTAURANT CORPORATION, Respondent,
v.
GENERAL INSURANCE COMPANY OF AMERICA, Appellant.[*]
No. 36745.
The Supreme Court of Washington, Department Two.
April 9, 1964.
Clarke, Clarke, Albertson & Bovingdon, for appellant.
Byron D. Coney, for respondent.
FINLEY, J.
The Washington Restaurant Corporation, operating the Maison Blanc restaurant in Seattle, sued General Insurance Company to recover under an insurance policy, ostensibly covering a business interruption loss resulting from fire. This appeal is from a judgment against the insurance company for the full amount of the policy, $9,000, plus interest from October 29, 1960.
The provisions of the contract (fire insurance policy) which are pertinent to the problem of coverage in this appeal are as follows:
"9000.00 ON GROSS EARNINGS ... (SHORT FORM) ...
"Subject to Form No.(s). 570-XNS (7-54, 202 NS (10-58) ..."
and Form 570-XNS, attached thereto, reads in part as follows:

"GROSS EARNINGS FORM NO. 5
"...
"1. The `Gross Earnings' Item shall cover the actual loss sustained to Gross Earnings directly resulting from necessary interruption of business caused by damage to or destruction of real or personal property on the described premises by the peril(s) insured against during the term of this policy.
"(a) Limits of Liability:
"(1) This company shall be liable for loss occurring during only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the real or personal property on the described premises as has been damaged or destroyed ...
*152 "(2) The liability of this company shall be limited to thirty-three and one-third per cent (33 1/3%) of the amount specified for this item for any one period of thirty (30) consecutive calendar days
"...
"(b) Computation of Claim: In the computation of any claim under this Item due consideration shall be given (1) to the experience of the business before the date of damage or destruction, and to the probable experience thereafter, had no loss occurred; (2) to the saving of or to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss; ..."
The Maison Blanc was for many years a popular and profitable restaurant in Seattle, but subsequent to the death of its founder and guiding spirit it became involved in financial difficulties. Ultimately, it was sold to Homer W. Robinson, an old-time patron of the establishment. He organized the respondent corporation, of which he was sole owner, for the purpose of restoring this once famous epicurians' delight to its former glory. After 19 months under the hopeful new setup, a damaging fire occurred on the premises, and necessitated closing the restaurant. The trial court found that repairs and restoration of the premises could not have been accomplished in less than 3 months. The Maison Blanc's average monthly operating experience for the 19 months prior to the fire had been:

 Total income from sales ........................... $13,384.00
 Cost of food and liquor ......................... 5,939.00
 __________
 Gross profit or earnings ...................... 7,445.00
 Operating expenses .......................... 10,886.00
 __________
 Monthly net operating loss .................... $-3,441.00

Although the monthly net loss averaged $3,441 prior to the fire, the expenses which necessarily continued after the fire averaged only $2,933.33 for the first 3 months. It is therefore readily apparent that the net operating loss was actually reduced during the period. In the trial court it was the primary contention of the insurance company *153 that, on the basis of the above accounting, the fire, in effect, saved money and caused no loss to the insured  or at least no loss covered by the terms of the policy.
The trial court found, however, that the policy had insured the gross earnings or profits of the business rather than the net profit or loss. As this gross-earnings figure was in excess of the $3,000 per month limitation of the policy, judgment was entered for plaintiff-respondent for the entire face value of the policy, $9,000; i.e., $3,000 per month for 3 months.
On this appeal the insurance company again contends that there was no loss to the business which could be attributable to the cessation of operations, and, therefore, respondent had no insurable interest in the gross profits of the business. Appellant further contends that, regardless of the nature of any possible loss sustained by the respondent, the loss was not one which was covered by the clear and unambiguous terms of the policy.
[1] The first step in the solution of the instant case is to evaluate the consequences of the fire to ascertain whether any insurable loss was suffered by the insured. With this accomplished, the remaining problem is to evaluate and determine the scope of the insuring language used by the insurance company, keeping in mind the rule that if the insuring language is ambiguous, i.e., if reasonable men could differ as to whether it fairly covered the loss sustained, then the insured must prevail. The rule is well established that language should be construed in favor of the insured if it is susceptible of more than one meaning. 83 A.L.R. (2d) 895.
[2] The actual monetary loss sustained by the insured as a result of the fire can be understood more readily in a broad business sense, perhaps, than in terms of the technique and terminology of the accountant, particularly if we contrast or distinguish (a) the operating loss of a continuing or going business and (b) fixed expenses or loss attributable to business interruption or closure. Expenses of $2,933.33 per month continued after the closure of the business. This represented a cash outlay by the respondent *154 for which it could receive nothing  neither a present return nor hope for a future one. While an accountant might consider the end result as a reduction in net operating loss (being less than $3,441 monthly loss prior to the fire), no business man would call it a saving in the sense that positive and affirmative business benefits accrued to the insured. The pre-fire loss certainly has an entirely different quality from the loss occasioned by the expenses which continued after closure. Although, undeniably, the pre-fire loss did amount to a loss in an accounting sense, in a business sense it could be called an investment  common in new businesses  in future earnings and good will. The insured, a man of no small business ability, considered this $3,441 monthly outlay as being made for a valid business purpose. He believed he was receiving a quid pro quo of dollar value for every dollar so spent, and voluntarily continued the outlay.
Quite to the contrary, however, was the cash outlay which could be anticipated as continuing even if the business was closed. The expenditure of something for something would become an expenditure of something for nothing. Surely the prudent business man would begrudge an anticipated monthly expenditure of $3,000 (the actual amount proved to be $2,933.33) paid for nothing, even when he was willing to gamble a greater amount for the prospect of future returns. And, if these anticipated continuing expenses would be a less desirable type of "loss," then it is not surprising that Robinson, the owner-promoter, evidenced a desire to carry insurance which would pay an amount which would cover these continuing expenses if the business should be interrupted due to fire.
There is considerable evidence that in this transaction Robinson both asked for and thought he received a type of insurance which would provide a fund to pay continuing expenses, regardless of whether the restaurant was at the time of the loss in a profit position. In this connection, it seems apparent that the owner, Robinson, anticipated some losses in attempting to re-establish the business. The plaintiff's insurance broker, J.G. McCrary, testified as *155 follows concerning his understanding with Mr. Hemion. the underwriter for the defendant insurance company:
"Our conversation, our discussion as to how much and what form was quickly relegated pure and simply to continuing expenses, since there was no precedent, no history to insure gross earnings as such, to insure income as such ...
"...
"... That is how it relegated itself to this subject; We don't know how well they're going to do; We do not know what earnings to insure; But we do know what the continuing expenses would be; can we insure continuing expenses, and the underwriter's answer was, yes, that under this short form we can insure continuing expenses.
"...
"... I then discussed with the insured what would the continuing expenses be on a permanent basis. At that time under ... rules up to 33 1/3% of the indemnity could be paid per month. It was on that basis then, figuring that $3,000 would be the aggregate of the monthly income necessary, that would then be $3,000 a month maximum for 3 months, or $9,000.
"...
"... between the assured and the underwriter, Mr. Hemion, it was agreed that 3 months would be a suitable period to continue the indemnity; that these costs, for instance, to keep a chef on the payroll, to meet the continuing expenses, the 3 months would be adequate."
It might be noted that the estimate of $3,000 for insurance coverage was very close to what the continuing expenses would be, the actual figure being $2,933.33. To sum up: apparently the insured, the insurance broker, and the insurance underwriter all thought that the policy issued would provide a flow of income, in lieu of gross earnings, sufficient to cover the continuing expenses of the restaurant while it was closed. The trial judge found that the insured had the right, after paying his premiums, to feel that his gross earnings were insured up to a maximum or funded amount of $3,000 per month for 3 months, a total of $9,000, to cover continuing expenses while the Maison Blanc was closed.
*156 All of the above persons presumably reached their conclusions as to what was insured after reading the language of the contract  that same language which appellant now claims is clear and unambiguous in limiting its protection to a decrease in net profit. Turning to the specific language, it appears that wherever the type of insurance is mentioned in this contract it is referred to as "gross earnings." The endorsement itself carries the bold face heading, "GROSS EARNINGS FORM NO. 5." The general insuring language states at the outset: "The `gross earnings' item shall cover the actual loss sustained to gross earnings ..." Gross earnings is nowhere defined and, presumably, is left to general accounting principles. Under the evidence, gross earnings was found to be the total sales, less cost of goods sold. The use of gross earnings as a measure was explained by the testimony of the insurance broker as simply the most convenient method available to make sure that the $3,000 amount would be available to cover continuing expenses. The gross earnings could certainly be expected to decline by at least that amount in the case of closure, whereas the resultant change in net profits was a matter of complete uncertainty. It is interesting to note that the parties were not interested in insuring the entire gross earnings (averaging monthly $7,445), but only $3,000 of it  the amount which would cover continuing expenses. This only serves to re-emphasize that the clear intent was to provide for continuing expenses, in the event of closure because of fire, and not for some possible change in the net income of an unpredictable business enterprise.
The language upon which the appellant relied in rejecting the claim of the insured plaintiff is found farther down in the body of the contract under a section labeled, "computation of claim," and reads as follows: "... due consideration shall be given ... to the saving of or to the continuation of normal charges and expenses ..." (Italics ours.) This language cannot be considered as free from ambiguity; nor is its relationship to the general insuring language a matter of certainty. "Due consideration" is a vague, ambiguous expression if the mandatory deduction *157 of all saved expenses was contemplated. The reference to saved expenses is certainly possessed of no more clarity than the reference to continuing expenses, the very item that the parties apparently thought they had insured.
The conclusion seems inescapable that the coverage language in question is ambiguous and could easily be construed to insure the first $3,000 of gross earnings each month, regardless of the net profit position of the insured, in order to pay the anticipated continuing expenses. The case, therefore, comes within the oft repeated rule that ambiguity in the language of an insurance contract should be construed in favor of the insured. The judgment of the trial court should be affirmed. It is so ordered.
OTT, C.J., DONWORTH and HAMILTON, JJ., concur.
POYHONEN, J.[] (dissenting)
The majority find ambiguous and vague the meaning of "loss to gross earnings" and "due consideration."
Were this a question of first impression in the field of business interruption insurance (also called loss of use and occupancy insurance), it would not be difficult for me to accept that finding. But, so far as I am able to determine, the decided cases hold otherwise.
First as to good will. I agree that the respondent must necessarily have sustained a real, monetary loss by reason of the interruption of its restaurant operations. It had been operating for 19 months at an average monthly loss of $3,441, but in the hope and expectation of future profits. The fire impaired the value of the pre-fire investment. It undoubtedly damaged the good will of the business and its expectations of future profits. In this respect, respondent's plight was not unique. Any business, whether operating at a profit or loss, suffers a probable, or possible, loss of good will and public acceptance when calamity interrupts its operations. After the fire, the respondent had two choices. It could have terminated the business and spent no more money. It decided to continue to spend money to *158 get back into business, but in doing so it was not, as the majority say, spending something for nothing. It was investing in the future, just exactly what it had been doing prior to the fire. And it was still spending the same kind of dollars.
But good will and expectations of future profit were not insured. The contract by its terms limited respondent's recovery to actual loss sustained to gross earnings, during the period of interruption only, and directly resulting therefrom, and excluded other consequential or remote losses.
It appears crystal clear to me that the policy was not good will insurance. As to whether there is good will insurance available in the market, I have no opinion and the evidence does not disclose. But the effect of the majority opinion is to compensate respondent for damage to good will, which was not insured, under the guise of construing the meaning of "loss to gross earnings," which was insured.
I pass now to the problem of what is meant by "loss to gross earnings" and "due consideration."
In construction and interpretation of business interruption insurance policies, the courts have uniformly followed and applied the recognized and accepted rules which are applicable to insurance policies generally: (1) that the interpretation must be reasonable; (2) that the contract should be interpreted to give practical effect to the intentions of the parties; (3) that the language must be given the meaning which a person of ordinary intelligence would attribute to it; (4) that effect should be given to every word and expression of the policy if possible; and (5) that it should be construed in favor of the insured if susceptible of more than one meaning or ambiguously expressed. 83 A.L.R. (2d) 895, 896, and cases cited. However, an ambiguity does not arise merely because the parties differ as to an interpretation of any provision. Foote Mineral Co. v. Maryland Cas. Co., 173 F. Supp. 925. Nor is a court privileged to disregard or distort language of a policy which is plain and unequivocal, nor is it at liberty, under the guise of interpretation, to restrict the meaning of language which is clear. Truck Ins. Exch. v. Rohde, 49 Wn. (2d) 465, 303 *159 P. (2d) 659, 55 A.L.R. (2d) 1288; Rew v. Beneficial Standard Life Ins. Co., 41 Wn. (2d) 577, 250 P. (2d) 956, 35 A.L.R. (2d) 891; Firemen's Ins. Co. v. Lasker, 18 F. (2d) 375; National Children's Expositions Corp. v. Anchor Ins. Co., 279 F. (2d) 428, 83 A.L.R. (2d) 879; American Alliance Ins. Co. v. Keleket X-Ray Corp., 248 F. (2d) 920.
In interpreting and construing the contract before us, we must be aware of the backdrop of the practices, understandings, terms, and principles generally recognized, accepted, and followed in the insurance world, in the development of which judicial decisions have played their part. In the relatively new field of business interruption insurance, certain practices and principles have emerged, and certain terms and expressions have already acquired commonly accepted and recognized meanings. It is necessary to note the two types of policies commonly written, open and valued.
The valued policy is one in which the value of the loss is agreed upon in advance and the amount to be paid by the insurer is fixed in the policy. Example: An agreement to pay $1,000 a day for each day of shutdown resulting from the occurrence of a peril insured against. Respondent urges that the contract here is a valued policy. It does not appear that the trial court so found, and it is obvious to me that it is not. I have found no decision supporting respondent's position, and respondent has cited none. The one case cited, Anderson & Middleton Lbr. Co. v. Lumbermen's Mut. Cas. Co. 53 Wn. (2d) 404, 333 P. (2d) 938, is not in point, since the policy there involved was admittedly a valued one providing for the payment of a fixed sum for each day of loss of use and occupancy.
The open policy is one in which the amount of any loss sustained is not agreed upon in advance, but is to be determined by competent evidence. The earlier policies of this type usually insured (1) net profits prevented by interruption, plus (2) such fixed charges and expenses as necessarily continued during suspension to the extent only that they would have been earned had no interruption occurred, plus (3) expenses incurred to reduce the loss. A *160 second type, more common at present, generally known as the gross earnings form, insures loss of gross earnings less charges and expenses saved during the period of interruption. Both open types accomplish the same result. Both recognize that a business operating at a profit is entitled to recover within policy limits its net profits lost, plus the necessary expenses that continue, during the interruption, and that a business operating at a loss is, nevertheless, entitled to recover those expenses which continue during the interruption to the extent that it would have earned them had no interruption occurred. The purpose in either case is to do for the insured just what the business itself would have done, no more or less, had there been no interruption.
83 A.L.R. (2d) 890:
"... the purpose of the contract is the payment of profits and legitimate continuing charges or expenses in the event of the loss or destruction of the property; that its purpose is to protect the prospective earnings of the insured business and it might better be termed `earnings insurance'; that such insurance was designed to do for the insured in the event of business interruption, just what the business itself would have done if no interruption had occurred; ..."
A case very much in point is Goetz v. Hartford Fire Ins. Co., 193 Wis. 638, 215 N.W. 440. The policy insured against actual loss to net profits plus fixed charges continuing. The insured business had been operating at a loss. The insured argued that the insurer's liability to pay the continuing fixed charges was absolute and was not dependent upon whether they would have been earned if interruption had not occurred. The court held that there was no actual loss sustained by the insured, for, as it could not have received from the conduct of the business anything to be devoted to the payment of such fixed charges, it could not properly be considered as having lost such sum which it could not have had, fire or no fire.
It is apparent, then, that the fundamental principle of business interruption insurance is one of indemnity, and a *161 showing of pecuniary damage is prerequisite to recovery thereon. National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp., 141 F. (2d) 443; Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co., 4 F. (2d) 835; Hutchings v. Caledonian Ins. Co. of Scotland, 52 F. (2d) 744; Fidelity-Phenix Fire Ins. Co. of New York v. Benedict Coal Corp., 64 F. (2d) 347; 5 Appleman, Insurance Law and Practice § 3120, p. 277.
It will be found, too, that the term "due consideration" contained in paragraph 1(b) of the policy has acquired a generally understood and accepted meaning synonymous with "practical" or "rational." Puget Sound Lbr. Co. v. Mechanics' & Traders' Ins. Co., 168 Wash. 46, 10 P. (2d) 568; General Ins. Co. of America v. Pathfinder Petroleum Co., 145 F. (2d) 368. The courts have uniformly held that losses shall be determined in a practical way. National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp., supra; Lite v. Firemen's Ins. Co., 119 App. Div. 410, 104 N.Y.S. 434; Hawkinson Tread Tire Ser. Co. v. Indiana Lumbermens Mut. Ins. Co., 362 Mo. 823, 245 S.W. (2d) 24.
It seems clear to me that paragraph 1 of Form No. 5, which contains all of the provisions of the policy with which we are here concerned, means only that in the event of a business interruption there shall be a practical and rational approach toward a determination of what actual money, if any, the insured is losing by reason of the interruption and during the interruption only. This interpretation gives effect and meaning to all of the provisions of the policy, is in harmony with the fundamental indemnity principle of insurance, and is in harmony with the decided cases. Any other interpretation ignores the computation of claim provisions entirely and renders them completely meaningless.
This court said in Sears, Roebuck & Co. v. Hartford Acc. & Indem. Co., 50 Wn. (2d) 443, 449, 313 P. (2d) 347:
"... Since an insurance policy is merely a written contract between an insurer and the insured, courts cannot rule out of the contract any language which the parties thereto have put into it;..."
*162 Respondent's monthly net operating loss prior to the fire was $3,441. The expenses which necessarily continued during the 3-month period of interruption amounted to $2,933.33 per month. It is readily apparent, then, that the business would not have earned during the 3-month period in question, had no interruption occurred, any part of the expenses which necessarily continued during the period of interruption. Conclusion: There has been no compensable loss under the terms of the policy.
I do not mean to say that respondent was financially better off by reason of the fire. True, it lost less money during the period of interruption than it would have lost during the same period had no interruption occurred. The actual loss was in damage to good will, probability of public acceptance, and expectations of future profits. But, unfortunately, these were not insured.
I would reverse and dismiss the action.
NOTES
[*] Reported in 390 P. (2d) 970.
[] Judge Poyhonen is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.