[No. 39451.    En Banc.    March 12, 1970.]

LIGE DICKSON *et al.*, *Respondents*, v. UNITED STATES FIDELITY AND GUARANTY COMPANY, *Appellant.**

*Reported in 466 P.2d 515.

*Clarke, Clarke, Albertson & Bovingdon* and *R. B. Albertson,* for appellant.

*Comfort, Dolack, Hansler & Billett,* by *Robert A. Comfort,* for respondents.

NEILL, J.—This is an action by the insured under an "all risk" contractor's equipment floater insurance policy. On August 1, 1963, one of plaintiffs' cranes, covered by the insurance policy, was damaged when its boom collapsed while engaged in pulling "H" beams out of the ground on a highway project. The crane contained a defective weld where a cross-brace was attached to a longitudinal member of the boom. It is not disputed that this defective weld was a latent defect. Following a trial before the court, judgment was entered for plaintiffs in an amount representing the replacement cost of the crane boom.

Defendant appeals. Assigned errors relate to five issues: (1) finding by the trial court that the local insurance agency was agent of the defendant; (2) whether suit was timely filed; (3) applicability of an exclusionary provision of the insurance policy; (4) whether the collapse of the boom was caused by an "external cause" or by "latent defect" in the equipment; and (5) measure of insured loss.

The insurance policy contains the following condition:

11. *Suit.* No suit, action on proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced

within twelve (12) months next after discovery by the Insured of the occurrence which gives rise to the claim . . .

The trial court ruled that defendant was estopped from claiming the failure to bring the action within 12 months from the date of the accident as a defense.

Plaintiffs made demand for payment of their loss under the policy through Comfort, Davis & Blangy, Inc., the agent of the insurance company from which they purchased the policy. Defendant's Seattle claims agent, Gordon W. Foster, denied the claim on October 21, 1963. The notice of rejection was sent to Comfort, Davis & Blangy, Inc. Mr. Comfort indicated to plaintiffs that in his opinion the loss was within the coverage of the policy, and that the insured should seek a review of the rejection by the company's home office. In December, 1963, Mr. Lige Dickson, Mr. Comfort, and Mr. Foster met to discuss the claim. It was decided that defendant's home office would be requested to review the claim. Mr. Foster was to forward the file to the home office in Baltimore, Maryland. Due to the inadvertence of Mr. Foster, the file and request for review were not sent until sometime in June, 1964. The home office rejected the claim and so notified Mr. Foster on July 14, 1964. Mr. Foster in turn informed Mr. Comfort of the rejection. Sometime in August, 1964, Mr. Comfort again conferred with officials in defendant's Seattle office concerning the claim and was advised that the home office decision was final. Mr. Comfort thereafter notified Mr. Dickson of the adverse home office decision. This action was commenced on February 8, 1965.

█ Although we do not consider the point to be determinative in view of the action of defendant's admitted agent, Mr. Foster, we do not reach the assignment of error that the trial court was wrong in its finding that Mr. Comfort was an agent of the defendant. Mr. Comfort was an officer of Comfort, Davis & Blangy, Inc. Defendant did not argue or discuss this assignment of error in its opening brief; so we consider the assignment abandoned. Contentions may not be presented for the first time in the reply

brief. *Fosbre v. State,* 70 Wn.2d 578, 424 P.2d 901 (1967); ROA I-41 (1).

■ The doctrine of equitable estoppel rests on the principle that where a person, by his acts or representations, causes another to change his position or to refrain from performing a necessary act to such person's detriment or prejudice, the person who performs such acts or makes such representations is precluded from asserting the conduct or forbearance of the other party to his own advantage. *Kessinger v. Anderson,* 31 Wn.2d 157, 196 P.2d 289 (1948); *Nelson v. Bailey,* 54 Wn.2d 161, 338 P.2d 757, 73 A.L.R.2d 1400 (1959).

■ The representations made by defendant's agent, Mr. Foster, that the rejection of the claim was not final, caused plaintiffs to refrain from commencing an action until final rejection by the home office was received. The failure of Mr. Foster to forward the claim to the home office for a period in excess of 6 months logically excused plaintiffs from complying with the terms of the policy during this period. Plaintiffs were not notified of the final rejection by the home office until after August 1, 1964. Applying the above rules to the particular facts of this case, the trial court did not err in concluding that defendant was estopped to raise the 1-year limitation as a defense.

Plaintiffs had a reasonable time after notification of the final denial of liability to commence their action. *Insurance Co. of North America v. Board of Educ. of Independent School Dist. 12,* 196 F.2d 901 (10th Cir. 1952). October 9, 1964, plaintiffs' attorney made a formal demand for payment, which was refused by defendant on October 27, 1964. Within approximately 100 days thereafter this action was commenced. The trial court found that plaintiffs commenced suit within a reasonable time after learning of the final decision of defendant's home office. What constitutes a reasonable length of time under the instant circumstances is a factual determination, and we will not substitute our judgment for that of the trial court.

Defendant's third and fourth assignments of error relate to whether the loss is within the policy coverage and

whether the loss was caused by an "external force" or by a "latent defect" in the boom of the crane. The pertinent provisions of the policy as to coverage and exclusion are:

This Policy Insures:

Against all risks of direct loss of or damage to the insured property from any external cause, except as hereinafter provided.

This Policy Does Not Insure Against:

(a) [$50 deductible clause];

(b) Loss or shortage disclosed upon taking inventory;

(c) Loss or damage caused by or resulting from the weight of a load exceeding the registered lifting capacity of any machine;

(d) Wear and tear, latent defect, gradual deterioration or mechanical breakdown;

(e) Loss or damage caused by or resulting from infidelity of Assured's employees . . . [etc.]

Each succeeding clause of exclusion refers to loss or damage "caused by or resulting from" specified events or to losses occurring under circumstances not relevant here.

■ Exclusionary clauses in an insurance policy are to be construed most strongly against the company writing the policy, and in favor of the insured. *S. L. Rowland Constr. Co. v. St. Paul Fire & Marine Ins. Co.,* 72 Wn.2d 682, 434 P.2d 725 (1967); *Safeco Ins. Co. of America v. McManemy,* 72 Wn.2d 211, 432 P.2d 537 (1967); *Washington Restaurant Corp. v. General Ins. Co. of America,* 64 Wn.2d 150, 390 P.2d 970 (1964); *Thompson v. Ezzell,* 61 Wn.2d 685, 379 P.2d 983 (1963); *Selective Logging Co. v. General Cas. Co. of America,* 49 Wn.2d 347, 301 P.2d 535 (1956). When the insurance company changed the language of exclusion (d) from the language it used in the other exclusionary clauses, it thereby manifested an obvious intent that the clause *not* read "loss or damage caused by or resulting from . . . latent defects," but rather that the exclusion apply only to the latent defect itself. *E.g., see Tucker v. Bankers Life & Cas. Co.,* 67 Wn.2d 60, 406 P.2d 628 (1965); *S. L. Rowland Constr. Co. v. St. Paul Fire & Marine Ins. Co., supra.* In the face of such a manifestation, the insurance company cannot successfully assert its own

subjective intent. *Safeco Ins. Co. of America v. McManemy, supra,* and cases cited.

Had the insured made claim under this policy for the cost of repairing the defective weld or for repairs to the machine necessitated by wear and tear, deterioration or breakdown, the quoted exclusion would apply. This, however, is not such a claim. It is this construction of the policy that the trial court obviously adopted, and we are in accord.

In further support of the trial court's construction is our familiar rule that, as between two possible constructions, one of which would make the contract unreasonable and imprudent and the other of which would make it reasonable, fair and just, the latter interpretation will be adopted. *Dickson v. Hausman,* 68 Wn.2d 368, 413 P.2d 378 (1966); *Patterson v. Bixby,* 58 Wn.2d 454, 364 P.2d 10 (1961). This rule precludes the reading of exclusion (d) that is urged upon us by the defendant insurer. Such an interpretation would exclude any and all "loss or damage caused by or resulting from wear and tear, latent defects, gradual deterioration or mechanical breakdown" even though the clear cause of the loss was a "direct loss . . . from any external cause." What loss or damage would not, at least in part, be caused by or result from a "mechanical breakdown?" Exclusion (d), as read by the insurer, erases many obvious risks and an "all risk" policy could be thus transformed into a nearly "no risk" policy. If that is what the insurer intended, it should have said so in exclusion (d), as it did in exclusions (c), (e), (f), etc. It is more reasonable to interpret exclusion (d) as did the trial court.

The defendant argues that plaintiffs' contention that the "latent defect" exclusion is not applicable is not before us on the ground that no finding of fact on this issue was presented to or made by the trial court. The record discloses that the defendant proposed a finding that the loss was not within the policy terms, but the trial court refused to enter such finding. The court did enter a finding that "The boom collapse was not caused by wear and tear, la-

tent defect, gradual deterioration or mechanical break-down." (Finding of fact No. 7.) In *Kinnear v. Graham,* 133 Wash. 132, 133, 233 P. 304 (1925), we stated:

> The purpose of findings is to enable this court to review the questions upon appeal, and when it clearly appears what questions were decided by the trial court, and the manner in which they were decided, we think that the requirements have been fully met.

*Accord, Heikkinen v. Hansen,* 57 Wn.2d 840, 360 P.2d 147 (1961). It is apparent that the trial court ruled directly on this matter both by its oral decision and its refusal to enter defendant's finding on the point. Formal findings, although preferable, are not the sole method of obtaining the knowledge of the factual foundation for the trial court's decision. As we reiterated in *In re Todd,* 68 Wn.2d 587, 592, 414 P.2d 605 (1966):

> We are not persuaded that the omission of findings of fact is necessarily fatal. We have on previous occasions referred to written memorandum decisions or stenographic transcriptions of oral decisions in order to determine the factual basis for trial court decisions. [Citations omitted.]

The record before us presents just such a case. This aid to clarification is not only available, but was expressly offered by the trial court. At the hearing on presentation of findings, the court stated:

> If the Supreme Court can read the memorandum opinion together with the findings. It is apparent, but this certainly I think pinpoints perhaps a little better what I had in mind . . . I recall now my feeling as to what the term "latent defect" excluded from the policy, and I said then and I say now that this isn't a suit to recover for a latent defect.

The trial court also based its conclusion upon an alternative ground that the defective weld was not the responsible cause of the loss.

The trial court concluded that the policy covers this loss, even if the exclusion were construed to include a loss caused by latent defects, since an insured external cause was responsible for this loss. We agree.

Defendant's expert witness testified that the collapse of the boom was due to the failure of the defective weld on the boom. His version of the cause of the loss was that the weld failed under the stress of the lift, thus causing the boom to collapse. Thus, contends the defendant, the failure of the defective weld was not just a cause, but was the sole cause of loss. If the failure of the weld at the cross-bar was the only cause, that would constitute responsible cause as a matter of course. There would then be no need of proceeding further to determine, as between two or more causes, which was the "direct, violent and efficient cause of the damage." *Bruener v. Twin City Fire Ins. Co.*, 37 Wn.2d 181, 222 P.2d 833, 23 A.L.R.2d 385 (1950).

Neither party contends that the crane was being operated with a load in excess of its rated capacity. The question is the existence or nonexistence of an external cause.

Plaintiffs do not contradict the testimony of defendant's expert witness that there was a defective weld on one of the cross-braces on the boom, but do point out that this cross-brace does not contribute materially to the longitudinal strength of the boom. The record shows the presence of an external force which has acted as the direct, violent and efficient cause of the loss. The trial court correctly so found. There is substantial evidence in support of findings (a) that earth, collapsing onto an "H" beam that was being removed, caused a sudden stoppage of the hoist; (b) that this sudden stoppage caused an abrupt increase in load on the boom structure; and (c) that this abrupt increase in load (impact) caused both the breakage of the weld and the collapse of the boom. The sudden "freezing" of the beam by the earth created a sudden, external force on the boom which then failed at its weakest point—the defective weld. The collapse of the boom was the end result.

The testimony of the crane operator and his helper is the only direct evidence of the accident.[1] The testimony of

[1]Direct examination of crane operator called by defendant:

"Q. All right, then you say you had it, correct me if I am inaccurate, 10 to 12 feet up on the left, then what happened, what did you hear, or see, if anything? A. Evidently some of the dirt dropped back

defendant's expert witness pertains to events occurring after the weld snapped. He pointed out in his testimony that his investigation pertained only to the condition of the weld and cross-member that broke.

■ The trial court regarded the collapsing earth as the external and responsible cause of the failure of the weld and the collapse of the boom. He did not thereby rule in contradiction to our rule on insurance causation, as set forth in *Bruener v. Twin City Fire Ins. Co., supra,* wherein we stated that, for the purposes of insurance litigation, the responsible cause of a loss is that which is the "direct, violent and efficient cause of the damage." Even if the defective weld is regarded as a contributing cause of the

down in and it had come up probably six inches, then she just, pop. Q. What do you mean? A. Stopped. Q. Oh, stopped. A. Just like some dirt had dropped back in down there and sealed it off again. Q. Uh-huh. A. All at once (Witness snaps fingers.) A heck of a snap. Q. Did you hear something? A. Right. Q. Did you hear something? A. I thought something, somebody took a shot at me with a rifle. Q. You are still in the operator's seat, right? A. That's right. I was watching the top of that where I was hooked onto the H-beam. Q. You heard the noise, then what did you do? A. Didn't do nothing. I just sat there and watched the boom come down."

Cross-examination of crane operator:

"Q. As I recall, you said the dirt seemed to come in around? A. It seems to freeze up, as possibly you pulled it up, the, a rock or something had wedged. Q. Something wedged the H-beam? A. That's what it seemed like, so it would no longer come up. That's right. Q. When this dirt or something came around and wedged it, is that when it caught? A. Yes. Q. It caught, then the beam, I mean the boom? A. Then it snapped and— Q. But the snap came after it seemed to catch there, is that the sequence? A. Yes."

Direct examination of crane oiler (helper) called by defendant:

"Q. Where were you standing when this incident occurred? A. Right beside it. Q. And just tell me what you saw and heard? A. I heard this snap, then I was gone. I got behind it. Q. Before you heard the snap, were you observing the lift? A. Yes, I was watching it come out of the ground. Q. What was the stage of the lift when you heard that snap? A. It had come up about six or eight inches, just like Mr. Claybough said, it stopped, then I heard the snap and got behind the rig."

Cross-examination of crane oiler (helper):

"Q. The dirt seemed to cave in or stick around this immediately before the mishap, as Mr. Claybough said? A. I was watching the base of the pile as it came out of the ground. If it was starting to, stopped because the boom started to go or the boom started to go because it stopped, I don't know."

boom's collapse, the latent defect was not an efficient cause, but merely an inert condition contributing to the final result. There is no evidence whatsoever that the weld would have failed in the absence of the external cause. Neither is there evidence that, absent the external force, a broken weld would have brought on the boom's collapse. The only cause shown by the record that is direct, violent and efficient is the collapse of the earth onto the "H" beam. The trial court properly ruled that this was the responsible cause of the loss.

As the trial court can be sustained on either of its alternative grounds for holding defendant liable under its policy of insurance, that portion of the judgment should be affirmed.

Defendant asserts that the court erred in the amount of damages awarded for the loss. The policy is a "proportionate risk" policy whereby the insured will receive only that portion of actual damages which the insured value bears to the actual value of the insured item. The crane was insured for $20,000. During cross-examination of plaintiff Lige Dickson, he stated that the value of the crane was $30,000. No issue was made on this point until the time of the submission of findings of fact, at which time counsel for defense objected to the conclusion of law that plaintiffs were entitled to $3,174. Neither party submitted a finding on the value of the crane. The colloquy in the record does not give us any clue as to the trial court's view of that fact.

Accordingly, we remand for the entry of a finding of fact and judgment based on the fact so found as applied to the policy provision. The trial court may take further evidence as to the value of the crane at the time of the loss. Plaintiffs shall be entitled to costs.

ALL CONCUR.