Howard H. DRIGGS, Jr., et al., Plaintiffs,

v.

CREDIT ALLIANCE CORP., et al., Defendants.

CREDIT ALLIANCE CORPORATION, Plaintiff,

v.

Howard H. DRIGGS, Jr., et al., Defendants.

Nos. C 81–162, C 83–290.

United States District Court, N.D. Ohio, W.D.

July 25, 1984.

David Wicklund, Toledo, Ohio, for Howard H. Driggs, Jr.

John Landry, Toledo, Ohio, for Credit Alliance Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN W. POTTER, District Judge:

This is a suit brought under 28 U.S.C. § 1332, diversity of citizenship. It involves two consolidated cases. In Case No. C 81–162, Howard H. Driggs, Jr., Phyllis Fox Driggs and Driggs Dairy Farms, Inc. sued Credit Alliance Corporation, Leasing Service Corporation and Credit America Corporation for rescission of contracts on the grounds of fraud, forgery, failure of consideration and estoppel. In Case No. C 83–290, Credit Alliance Corporation sued Howard H. Driggs, Jr., Driggs Dairy Farms, Inc. and Phyllis Fox Driggs for recovery on the contracts which are the subject of Case No. C 81–162. Case No. C 83–290 was filed in the United States District Court, Southern District of New York and was transferred to the Northern District of Ohio. This Court, finding that the two cases involve common questions of law and fact, consolidated them by order of June 27, 1983.

Both parties submitted trial briefs and proposed findings of fact and conclusions of law. The trial was held before the Court on March 13 and 14, 1984. The Court granted the motion, under Fed.R. Civ.P. 41(b), to dismiss the claims against Credit America Corporation, there being no evidence in the record of this defendant's involvement in the transaction in question.

Pursuant to order of the Court, the parties submitted post-trial briefs and reply briefs as well as revised findings of fact and conclusions of law. The Court has considered all of the above and has made its own independent determination.

### Findings of Fact

Howard H. Driggs, Jr. (Driggs) and Phyllis Fox Driggs (Mrs. Driggs) are Ohio residents. Driggs Dairy Farms, Inc. is an Ohio corporation.

Credit Alliance Corporation (CAC) is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in the State of New York. Leasing Service Corporation (LSC) is a corporation organized and existing under the laws of the State of New York, having its principal place of business in New York. CAC/LSC are finance corporations with joint offices throughout the United States, including Orlando, Florida. They have significant business contacts in Ohio.

CAC is engaged in the commercial finance business and does no consumer financing. Its primary business activity is the purchase of chattel paper such as Conditional Sale Contract Notes (Contract Notes) from equipment dealers. Such paper is generated by "time sales" of equipment.

During the years 1980 and 1981, CAC purchased chattel paper generated by thousands of time sale transactions.

CAC does not buy, sell, service nor store equipment (other than repossessions). Its sole involvement in such transactions is as a financing source.

CAC prefers the use of its own forms in these transactions in order to maximize its ability to acquire a totally enforceable obligation, that is to minimize the risks it is exposed to in the transactions. Occasional-

ly CAC uses other forms which have been approved by its legal department.

If CAC's forms are used then either CAC or the dealer fills in the blanks on the forms. When CAC fills out the forms, it performs the ministerial task of filling in the description of the equipment, information related to the price of the equipment including the cash price, the time (credit) price and payment terms agreed upon between Seller and Buyer as furnished to CAC by the dealer.

The buyer is quoted two prices, the cash sale price and the time price. The "time-price differential" is the difference between these two prices. Routinely, when a dealer and his customer have decided on an item of equipment the dealer contacts CAC and/or one or more of its competitors and seeks to obtain financing for the transaction at an acceptable discount of the proposed "time price." If the finance company is willing to make such purchase at that acceptable discount, then it purchases the chattel paper.

Typically, CAC checks the credit of the buyer. CAC's determination as to whether to purchase the chattel paper is based on a combination of factors. The determination as to which combination of factors should be utilized and the weight given to each factor is a subjective one and varies from transaction to transaction.

It is CAC's policy not to fund the transaction, i.e. pay the dealer for the chattel paper, unless and until it is in possession of a Delivery/Installation Certificate (Certificate) signed by the buyer. Such Certificate is in part an estoppel certificate. It tells CAC that the buyer is aware that CAC is about to purchase the transaction and "in order to induce" CAC to make such purchase, represents that there are no defenses, offsets or counterclaims, as well as acknowledging complete and satisfactory delivery of the equipment. No officer or employee of CAC is ever authorized to fund a time sale transaction without receiving a Certificate signed by the buyer.

CAC is insistent upon the execution of this Certificate because it is unwilling to assume any risk other than the credit-worthiness of the buyer. CAC is unwilling to assume any risks relating to the equipment, its delivery or its condition.

CAC and LSC have no control over or ownership interest in any of the equipment dealers from whom they purchase chattel paper. CAC will review proposed transactions, perform credit checks (for its own protection) and if the credit is acceptable to it, notify the dealer of CAC's requirements for purchase of such chattel paper, such as guaranties, additional collateral, etc.

Mercury Machine Tool and Supply Corp. (Mercury) is one of hundreds of dealers from whom CAC purchased chattel paper during 1980–1981. CAC has never had control of or an ownership interest in Mercury. Currently, CAC is a creditor in Mercury's bankruptcy proceedings.

Mercury is a Florida corporation with principal business operations in Orlando, Florida. John W. Williamson (Williamson) was Mercury's owner, president and operating manager. Effective March 5, 1979, Mercury had a "dealer agreement" with CAC/LSC and subsequently had many dealings with CAC/LSC under this agreement. CAC presently has dealer agreements with approximately 400 companies.

CAC's sole relationship with Mercury was that of purchaser of chattel paper. Except for such purchases, CAC has no relationship with Mercury or any of its principals, including Williamson.

Mercury dealt with a large number of finance companies.

The dealer agreement between CAC/LSC and Mercury was not an agency agreement. The clause containing a right of first refusal has never been enforced by CAC. Mercury never honored such clause nor was it ever asked to do so by CAC.

Driggs and Williamson were long time personal friends, both having been residents of Toledo, Ohio. After Williamson moved to Florida, the two saw each other occasionally in Toledo and in Florida, and

the Williamson children spent holiday vacation periods at the Driggs' home in Toledo.

The relationship between Driggs and Williamson in October and November, 1980, was one of trust and confidence on Driggs' part.

On or about October 6, 1980 Williamson called Driggs about an investment opportunity. It involved Driggs' investment of $30,000, representing 30% of a $100,000 purchase price for certain equipment. The equipment would be resold within 120 days and Driggs would be guaranteed by Mercury and Williamson a profit of $6,000—at least an annual return of 60% if the equipment was sold within 120 days.

Driggs, in response to this telephone offer, promptly wired $30,000 to Williamson. He did not wait for any written confirmation. Nor did he ask for the name of any other investor or the specific item of equipment before wiring the money.

When Driggs discussed the deal with Driggs Dairy Farms, Inc. Comptroller Albert G. Rowand, Driggs told Rowand that he trusted Williamson implicitly.

Driggs advanced the $30,000 solely because he trusted Williamson's character and integrity.

On or about October 8, 1980, Williamson, on Mercury letterhead, wrote to Driggs confirming the telephone conversation. The letter contained the following language in addition to the summary: "It is our anticipation that this will not be a one-shot deal, but that it will be something that can be accomplished in the future when the opportunity presents itself again."

Driggs has never received back either his $30,000 investment or any of the promised profit.

A few days prior to October 24, 1980 Driggs and Williamson discussed another transaction which eventually became the transaction which is the subject of this action. The plan was for Driggs to purchase two machines through a finance company and lease them to a third party, Bryant Tool and Manufacturing, Inc.

(Bryant). Bryant would then make monthly payments in excess of Driggs' monthly payments which would be transmitted to the finance company and the excess would be set aside for Driggs' account. Driggs would obtain the following benefits from the transaction: (1) investment tax credit benefits, (2) the tax benefit of any depreciation, and (3) eventual ownership of two valuable machines. It was not contemplated that Driggs would invest any money. It was also contemplated that Driggs would have no risk of loss since both Mercury and Williamson were guaranteeing the transaction. Driggs asked for a written proposal. No mention was made of CAC at that time.

By letter dated October 24, 1980, Mercury confirmed the telephone conversation. There was only one additional item in the letter which had not been covered in the telephone conversation. "Driggs Dairy Co." would be required to guarantee the transaction. The letter also contained no mention of CAC/LSC.

Driggs agreed to go forward with the proposed transaction after consultation with his tax advisers and in reliance upon the representations of Mercury and Williamson.

Sometime after the receipt of the October 24, 1980 letter, Driggs was informed that the contract note to be executed was to be purchased by CAC. He was further informed by Williamson that he would be required to provide financial information about himself and his company and the guaranties of both Driggs Dairy and Mrs. Driggs. Driggs sent the requested information to Williamson.

Neither Driggs nor his wife, nor Driggs Dairy ever had any relationship of any kind with CAC or LSC prior to or subsequent to this transaction.

Williamson approached CAC, outlined the transaction and asked CAC whether it would be willing to purchase the resulting chattel paper. CAC agreed to consider the purchase of the chattel paper and requested from Williamson credit information on

Driggs and his companies. This information was furnished.

CAC made its own credit check in addition to reviewing the furnished credit information. On a single occasion, November 10, 1980, an employee (whose identity is unknown) who worked in CAC's credit department in its Orlando office spoke to Driggs or an employee of his or of Driggs Dairy to obtain credit information. That employee, or another employee in the credit department, within one day, spoke to Mid American Bank and the Toledo Credit Bureau to check Driggs' credit, which proved to be acceptable.

After receipt of the financial information provided by Driggs from Williamson, CAC approved the credit and so advised Mercury. CAC told Mercury its requirements for the purchase of the contract note, which included the guaranties of Driggs Dairy and Mrs. Driggs.

At no time during the month of November, 1980, save for the one telephone call referred to above, was there any credible evidence produced at trial that Driggs spoke to any officer or employee of CAC. Driggs testified that the only way he "knew" that he was talking to CAC employees Harold Kaplan (Kaplan), Randy Burden (Burden) and Daniel J. Rizzo (Rizzo) was that either Williamson identified one or more of them as such or they identified themselves. Kaplan and Burden are former officers of CAC. Rizzo was and is an Assistant Secretary of CAC. Driggs never heard their voices before the conversations he testified about and could not personally identify them. Although both Kaplan and Burden were apparently available for depositions, no one deposed either of these men. Driggs had the burden and the opportunity to show that they misled him.

There was no evidence that, during the month of November, 1980, any telephone calls were placed by Driggs to CAC/LSC and/or any of its officers or employees.

The one telephone call between Driggs and CAC referred to above related to the credit information and did not relate to the equipment.

Driggs alleged that CAC employees in telephone conversations told him that CAC would make certain that the equipment was installed at Bryant Tool before CAC paid Williamson/Mercury. Driggs did not meet his burden of establishing that an agent of CAC represented to him that funds would not be disbursed until CAC established that the machinery had been delivered. Driggs also alleged that CAC had in effect given a positive character/credit reference for Williamson. Driggs did not meet his burden of establishing that he relied on CAC for a character reference for Williamson. Nor did he establish that he succeeded in shifting to CAC his burden of assuring that the equipment was in place at Bryant Tool. (See Delivery/Installation Certificate, PX25.)

Driggs was unable to identify, of his own knowledge, any of the persons to whom he spoke on the telephone and who he thought were representatives of CAC, but rather relied upon the representations of Williamson that a certain person was on the telephone or on the representation of the person on the telephone calling him as to his own identity and representative capacity.

In December, 1980, after noticing that he had received credit for the Driggs account on the monthly report, Burden asked Rizzo who Driggs was, indicating that Burden had never heard of Driggs. Burden had originally introduced Mercury to CAC.

Upon instructions from Mercury, CAC performed the ministerial task of filling in a number of documents related to the transaction in question. These included the Contract Note (PX21). Information therein included the items of equipment, the cash sales price ($176,800), principal unpaid balance ($177,500), finance charge ($76,420), and the contract/time sales price ($253,920). The Contract Note also stated the address where the equipment would be located as well as a schedule of payments. CAC also filled out the form of lease containing the information in relation to the proposed lease with Bryant. It filled in the

guaranty of Driggs Dairy and Mrs. Driggs, the Secretary's Certificate and Consent of Stockholders of Driggs Dairy. At the request of Mercury and in accordance with its standard procedure, it turned over the aforementioned papers to an employee of Mercury, John Pender (Pender).

Pender was an employee of Mercury. He was not an employee or agent of CAC or LSC. Pender performed no functions for or at the behest of CAC.

Pender, at Mercury's request, flew to Toledo, Ohio on November 12, 1980 with the papers in hand and met with Driggs, Mrs. Driggs and an employee of Driggs Dairy who acted as witness and notary.

A number of the documents prepared by CAC were executed on November 12, 1980 and were returned to CAC's Orlando, Florida office the following day. Rizzo's worksheet (DXB) indicates that these included, among other documents, the Contract Note, a Delivery/Installation Certificate, Assignment Guaranties of Driggs Dairy and Mrs. Driggs, Secretary Certificate of Driggs Dairy, and Consent of Shareholders of Driggs Dairy. Rizzo testified that CAC/LSC required receipt of the above documents before funding the transaction. Rizzo also testified that a number of documents which CAC had prepared and which related to the leasing arrangement between Driggs and Bryant were not received by CAC until mid-December, 1980. He stated that these were not necessary for the funding of the transaction. Williamson forged signatures on these documents. The Court finds that the documents relating to the lease between Driggs and Bryant were not considered by CAC to be essential to the funding of the transaction and were not received by CAC on November 13, 1980.

The Contract Note provided in part as follows:

> Buyer further acknowledges notice of Seller's intended assignment/endorsement of this contract note, and upon such assignment/endorsement, Buyer agrees not to assert against any assignee/endorsee, hereof any defense, setoff, recoupment claim or counterclaim which Buyer may have against Seller, whether arising hereunder or otherwise.

Driggs testified that he did not sign the Delivery/Installation Certificate on November 12, 1980. Driggs states that before signing the Certificate he contacted Rizzo at CAC's office. He claims the call came from CAC, but there is no telephone record of any such call from CAC's offices. Driggs claimed that both Williamson and Rizzo represented to him in that call that the equipment was in place at Bryant's place of business. Rizzo testified that he did not recall ever talking to Driggs and denied ever making such a representation.

The Delivery/Installation Certificate provides in part as follows:

> We hereby acknowledge complete and satisfactory delivery/installation of the property described in the agreement between us dated November, 1980 and notice of your intention to sell such agreement and our note(s) to CREDIT ALLIANCE CORPORATION, New York, N.Y. In order to induce CREDIT ALLIANCE CORPORATION to purchase such agreement and note(s) we represent to it that the same are free from any defenses, offsets or counterclaims and we hereby waive any claim or offset as against CREDIT ALLIANCE CORPORATION and recognize its right to enforce such agreement and note(s) according to their terms free from any defenses, offsets or counterclaims.

CAC's policy on all transactions is not to fund any transaction unless and until it has received a Delivery/Installation Certificate signed by the Buyer. Its purpose is to be certain that the equipment has, in fact, been delivered and installed to the satisfaction of the Buyer. CAC will not purchase a transaction without such assurance since it is not willing to inject itself into the transaction between the Seller and Buyer.

On November 12, 1980, prior to the execution of the document package including the Contract Note and Delivery/Installation Certificate, Rizzo prepared a discount worksheet and math sheet on which he set

down the salient data. He noted on this all the documents which were not yet received but were to be received. He then telecopied the sheets to the Atlanta office with a request that a check be mailed to Orlando by express mail.

On November 13, 1980 CAC's Florida office received the check from its Atlanta office and held it awaiting delivery of documents.

After reviewing the documents, CAC delivered its check in the amount of $166,800 to Williamson and held $10,000 in reserve for Mercury.

CAC did not rely on the credit of Mercury, Williamson or Bryant in purchasing the chattel paper, but only on the credit of Driggs.

Williamson was a substantial stockholder in Bryant.

Subsequent to the execution of the documents, on or about November 18, 1980, CAC sent Driggs a verification letter (DXG) which enclosed a coupon book and requested that Driggs confirm the contract. By his signature on a copy of this letter, Driggs reconfirmed his waiver of defenses and that the equipment was completely and satisfactorily installed. The letter asked for a response and requested in underlined language that any discrepancy be noted. Driggs did nothing in this regard when he signed the copy and returned it to CAC without marking any discrepancies or changes.

The term "three-party transaction" when used by CAC and dealers in the equipment business does not imply that CAC is a party to the transaction. It differentiates between direct loans to an equipment user or dealer not involving the sale of chattel paper and those transactions which involve a seller and buyer and the assignment of the resulting paper to the funding source.

Williamson opened a bank account in the name of Driggs Leasing. This enabled him: to draw checks directly to the order of CAC; to show Driggs that there was an account in which to place the Bryant rental payments before transmission to CAC; and

to avoid making CAC suspicious of the transaction, thus concealing the fraud.

CAC received payments totalling $16,290. Two payments (one double payment) were made by Williamson on behalf of Driggs by cashier's check drawn upon the Driggs Leasing account, to the order of Leasing Service Corporation in the amount of $11,000 on December 3, 1980. One payment was made by Driggs by check drawn upon Howard H. Driggs, Jr. Leasing of Toledo, Ohio dated January 29, 1981, in the amount of $5,290.

It subsequently was discovered by the parties that Mercury was engaged in fraudulent schemes which included double financing of equipment, financing of non-existent equipment, fraudulent transfers and sale or lease of equipment to non-existent lessees. Many finance and leasing companies with which Mercury did business were victims of those schemes.

It is not common practice in the sales finance industry to conduct equipment checks before the purchase of chattel paper. The common practice is to rely on the written representation of delivery by buyers or lessees.

The machines described in the Contract Note never existed. The names and numbers were totally imaginary and made up from Williamson's "own mind." John Williamson pled guilty and was convicted of organized fraud in violation of Florida Statutes §§ 817.035, 817.036.

Sometime in late January or early February, 1981, Williamson/Mercury's fraud was discovered by the various finance and leasing companies and investigation revealed the multitude of fraudulent transactions engaged in by Mercury and Williamson.

When demand was made upon Driggs for payment under the Contract Note, CAC discovered that the Driggs equipment sold under the Contract Note did not exist.

CAC made demand upon Driggs to honor his obligations under the Contract Note and continue making payments. Driggs refused to do so.

CAC asserts that the present unpaid balance under the Contract Note is $238,050. (See PX 19.)

As of March 13, 1984, CAC calculated the amount of indebtedness due and owing to it by Driggs, Driggs Dairy and Mrs. Driggs at $238,050.00 plus interest of $58,817.26 or $296,867.26, plus attorney's fees expended and/or billed of $28,800.00, for a total of $325,667.26.

CAC asserts that the Contract Note involved a time sale of equipment by Mercury to Driggs and that, accordingly, the finance charge is not interest but rather a time price differential.

Plaintiffs assert that CAC's out-of-pocket loss on the transaction is $150,510.00. They reach this figure by subtracting from the cash price of $176,800.00 the $10,000.00 reserve fund and the $16,290.00 payments made. Driggs asserts that under Ohio Revised Code § 1343.03 the most that CAC can recover is approximately $200,328.00.

The Contract Note provides:

Intending that each and every provision of this contract note be fully effective according to its terms, the parties agree that the validity, enforceability and effectiveness of each provision hereof shall be determined by the law of the state of residence or principal place of business of the Buyer, Seller or Holder, whichever renders each such provisions effective.

The Court finds that CAC disbursed to Williamson/Mercury the sum of $166,-800.00.

## Conclusions of Law

The Court has jurisdiction over the subject matter in this action pursuant to 28 U.S.C. § 1332 and has personal jurisdiction over the parties.

Mercury Machine and Williamson perpetrated a fraud upon Howard Driggs, Jr., Phyllis Fox Driggs and Driggs Dairy Farms, Inc. and upon Credit Alliance Corp./Leasing Services Corp.

CAC took the Contract Note for valuable consideration, in good faith, without notice that Driggs had a defense against enforcement of the Contract Note. The dealings between CAC/LSC and Mercury/Williamson were at arm's length. There was no close business relationship ("close connectedness") between CAC/LSC and Mercury/Williamson. *Arcanum Nat'l Bank v. Hessler,* 69 Ohio St.2d 549, 433 N.E.2d 204 (1982); J. White and R. Summers, Uniform Commercial Code, § 14–8 (1972).

The direct contacts between CAC and Driggs which were established at trial did not amount to significant direct dealings between CAC/LSC and Driggs. Uniform Commercial Code § 3–305; *Morgan v. Depositors Trust Co.,* 33 UCC Reporter Service, 1473 (Maine Superior Ct., 1982).

The Contract Note between Mercury and Driggs which was assigned to CAC is a valid obligation in the hands of CAC. The waiver provisions of the Contract Note and the Delivery/Installation Certificate and the estoppel portions of the Delivery/Installation Certificate are valid and enforceable and thus, Driggs may not assert any defenses. Uniform Commercial Code § 9–206(1); *Credit Alliance Corp. v. Cornelius & Rush Coal Co.,* 508 F.Supp. 63 (N.D.Ala. 1980); *Credit Alliance Corp. v. David O. Crump Sand & Fill,* 470 F.Supp. 489 (S.D. N.Y.1979); 4 *Corbin on Contracts* § 899 (1951; 1984 Supp.); *Dickson v. U.S. Fidelity and Guaranty Co.,* 77 Wash.2d 785, 466 P.2d 515 (1980).

CAC/LSC's actions as they related to the transaction in question were commercially reasonable.

Mercury, Mercury's employees and Williamson were not actual or apparent agents of CAC/LSC.

The guaranties of Mrs. Driggs and of Driggs Dairy Farms, Inc. are valid and enforceable.

The Contract Note is subject to Ohio law. It is well settled that in Ohio any stipulation to pay attorney's fees as part of the costs of an action or an obligation is contrary to public policy. *Miller v. Kyle,* 85

Ohio St. 186, 98 N.E. 1135 (1911). CAC/LSC are not entitled to attorney's fees.

The Court finds CAC/LSC to be over-reaching in its calculation of damages. All parties to this action are the innocent victims of fraud. While the Court finds enforceable the waiver of defenses provisions of the various documents, it would be unconscionable under the peculiar circumstances of this action to allow all the damages claimed by CAC. The Court has balanced the equities of the case which the fraud of Williamson has imposed. See U.C.C. § 1–102; J. Calamari and J. Perillo, Contracts § 9–39 (1979). The Court will enforce the Contract Note only to the extent of CAC's damages. The Court finds that allowing CAC to recover the time price differential and the $10,000 reserve funds which were not disbursed, would allow CAC to unfairly benefit from the fraud perpetrated by Williamson. The Court will permit CAC to recover its actual damages from Driggs but not to profit from the fraud.

CAC may recover its out-of-pocket loss of $150,510 plus interest. The Court will treat CAC's out-of-pocket loss of $150,-510.00 as if accelerated (PX21). It will regard this amount as due and payable on December 13, 1980. CAC is entitled to interest on this amount at 10% from December 13, 1980 through the date of judgment. Ohio Revised Code § 1343.03. Thereafter, CAC is entitled to interest at the rate specified by 28 U.S.C. § 1961.

THEREFORE, for the foregoing reasons, good cause appearing, it is

ORDERED that judgment be, and it hereby is, entered in favor of Credit Alliance Corp. and Leasing Services Corp. and against Howard H. Driggs, Jr., Phyllis Fox Driggs, and Driggs Dairy Farms, Inc.; and it is

FURTHER ORDERED that CAC be, and it hereby is, awarded $150,510.00 plus interest on this amount as specified herein.