KARMICH INVESTMENT GROUP, INC., Appellee,

v.

W.M.R. RESTAURANT CORP. et al., Appellants.

[Cite as *Karmich Invest. Group, Inc. v. W.M.R. Restaurant Corp.* (1993), 86 Ohio App.3d 479.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–658.

Decided Feb. 23, 1993.

*J. Patrick Thomas,* for appellee.

*Burman & Robinson* and *Robert N. Burman,* for appellants.

---

PETREE, Judge.

Defendants W.M.R. Restaurant Corporation ("W.M.R.") and Richard Stewart appeal from a judgment of the Franklin County Municipal Court which, following a bench trial, held that defendants had breached their obligation to pay rent on a security system. The security system had been leased in 1990 by defendant W.M.R. from a company called BusinessWatch, which then assigned the chattel paper to plaintiff Karmich Investment Group, Inc. ("Karmich"), a New Jersey commercial leasing company engaged in the business of financing business equipment. Plaintiff filed suit for nonpayment of rent on October 22, 1991. Defendants answered and defended, claiming that the lease was ambiguous, that its terms were unconscionable, and that there was failure of consideration on the part of the vendor due to the defective nature of the equipment. These issues were tried before the court, which rendered judgment in favor of plaintiff on April 17, 1992 in the amount of $6,479.04, plus interest at the rate of ten per cent per annum.

Defendants appeal and assert the following assignments of error:

I. "That the decision of the trial court granting judgment in favor of the plaintiff and against the defendant(s) was against the manifest weight of the evidence."

II. "That Karmich had actual and/or constructive notice of the warranty modification to the lease and therefore was estopped from its reliance on that provision of the lease in which defendant(s) waived their claims, defenses, etc."

III. "That Karmich controlled and/or directed the actions of BusinessWatch in relation to the lease transactions and as a result thereof, BusinessWatch was the agent of Karmich and therefore the knowledge of the agent is imputed to the principal."

IV. "The Karmich introduced no evidence in support of its claim for reasonable legal fees."

 Defendants' first, second and third assignments of error present the issue of whether plaintiff was entitled to holder in due course protection under R.C. 1309.17 (UCC 9–206).[1] At the outset, we note that a reviewing court should not reverse a determination by the trier of fact if it is supported by some competent, credible evidence. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. It is primarily the function of the trier of fact to determine the weight to be given the evidence and the credibility of witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The evidence at trial established the following facts.

Defendant W.M.R. is a company which owns and manages several restaurants. Defendant Richard Stewart, M.D., is president of this company. In the fall of 1990, defendants sought to acquire some video surveillance equipment to protect the company's "City Lights" restaurant in downtown Columbus, Ohio. They were approached by an employee of BusinessWatch, which dealt in such equipment. Defendants negotiated with BusinessWatch and the parties were able to agree to terms both on a security system and a payment plan. W.M.R. decided to lease the equipment rather than purchase it because of an unfamiliarity with the operation of such equipment and because leasing offered better warranty service.

BusinessWatch ordered the video surveillance equipment and it was installed at the restaurant on October 15, 1990. The parties then closed the transaction on

---

1. R.C. 1309.17 states, in part:

"(A) Subject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith, and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under sections 1303.01 to 1303.78, inclusive, of the Revised Code. A buyer who as part of one transaction signs both a negotiable instrument and a security agreement makes such an agreement."

October 24, 1990. On that date, BusinessWatch presented defendants with a commercial equipment lease form listing BusinessWatch as the both the "vendor" and "lessor" and W.M.R. as the "lessee." The lease form provided that W.M.R. was to make monthly lease payments of $162.86 for thirty-six months for the rental of four video cameras, two black-and-white monitors, two simulated cameras and one standard eight-hour VHS recorder. The lease was signed by Dr. Richard Stewart, as president of W.M.R. and in his individual capacity as guarantor.

Prior to signing the lease, defendant Stewart objected to several provisions contained in the small print on the back of the lease. Specifically, Stewart noted that the lease contained an assignment clause, which read:

"15. ASSIGNMENT: NOTICE OF INTENDED ASSIGNMENT. Lessor may, without Lessee's consent, assign or transfer this lease or any Equipment, rent or other sums due or to become due hereunder, and in such event Lessor's assignee or transferee shall have the rights, powers, privileges and remedies of Lessor hereunder. Lessee hereby acknowledges notice of Lessor's intended assignment of Lessor's interest in this lease, and upon such assignment Lessee agrees not to assert, as against Lessor's assignee, any defense, setoff, recoupment, claim or counterclaim, that it may have against Lessor whether arising under this lease transaction or otherwise. Lessee shall not assign this lease or any interests hereunder and shall not enter into any sublease with respect to the Equipment covered hereby without Lessor's prior written consent."

Defendant Stewart called BusinessWatch and asked why there was such a clause in the lease. He became personally aware of plaintiff through this discussion and through a form he was asked to sign at closing. This form, which was printed on plaintiff's letterhead, stated that plaintiff was the lessor and defendants understood and acknowledged that the lease documents represented the entire agreements of the parties concerning the transaction and no other agreements concerning warranty, profits or performance existed.

After being reassured over the phone by a BusinessWatch employee about the role of Karmich, defendant Stewart signed the lease, the personal guaranty and the aforementioned "Notice of Acknowledgement and Understanding" form on plaintiff's letterhead. At the same time, Stewart also signed a limited warranty given by BusinessWatch to defendant W.M.R. Defendants were notified of the lease assignment on November 30, 1990.

During the fall of 1990, defendants experienced various equipment failures which resulted in warranty service being performed by BusinessWatch. In January 1991, they found that BusinessWatch had gone out of business and no longer could honor the warranty. Defendant then contacted plaintiff, which confirmed that BusinessWatch had ceased doing business. Though defendants

requested warranty service from plaintiff, plaintiff denied liability by virtue of paragraph fifteen of the lease, quoted above, which also contained a waiver of defense clause. Defendants informed plaintiff that they would no longer pay monthly rent on the defective security system and thereafter ceased doing so. Defendants only made five payments pursuant to the lease and then defaulted.

Ann Baccellieri, the manager of credit and collection at plaintiff's offices, testified at trial that her department approves credit and collects accounts receivable. She said that her records of the foregoing lease transaction showed that BusinessWatch submitted an application for financing of the security system to plaintiff for approval. As is plaintiff's typical practice, defendants' credit, trade and bank references were checked. She said that after these checks, plaintiff approved the financing and had no other role in the transaction except for calling to see if the equipment had in fact been received. She said plaintiff was never aware of any problems concerning the transaction. She further testified that BusinessWatch was listed as both "lessor" and "vendor" on the lease because BusinessWatch dealt with several other leasing companies to obtain financing for the equipment it marketed. She said that plaintiff was unaware of any warranty between BusinessWatch and defendants.

Given this evidence, defendants contend that plaintiff should not be afforded holder in due course protection by virtue of the waiver of defense clause. Further, defendants assert that plaintiff was acting as an agent of BusinessWatch or joint venturer in this transaction.

■ In a secured transaction, R.C. 1309.17 (UCC 9–206) places the assignee of a commercial equipment lease in the shoes of a holder in due course when a waiver of defense clause is included in the contract. *Independence Bank v. Ta Da, Inc.* (Mar. 5, 1987), Cuyahoga App. No. 51687, unreported, at 3, 1987 WL 7432. Though the assignee is not technically a holder in due course because a negotiable instrument under Article 4 of the Uniform Commercial Code is not involved, R.C. 1309.17(A) gives the assignee with a waiver of defense clause the right to avoid all defenses except those that are good against a holder in due course under R.C. 1303.01 to 1303.78. To qualify for this type of holder in due course protection, however, the assignee must take for value, in good faith and without notice of a claim or defense.

It is undisputed that the lease here was taken for value, so the only question that remains is whether plaintiff exhibited good faith and made the assignment without notice of the lessee's warranty claim. On this score, defendants contend that plaintiff's level of involvement in this transaction demonstrated a lack of good faith. We cannot agree. On the contrary, the evidence allowed the trial court to conclude that plaintiff's role in this typical commercial lease transaction

was as a secured creditor and defendants cannot point to any improper level of control over the transaction.

As the court explained in *Konicki v. Salvaco, Inc.* (1984), 16 Ohio App.3d 40, 16 OBR 43, 474 N.E.2d 347, leasing companies frequently act as middlemen between the vendor and the purchaser of goods. In this capacity, the leasing company provides resources in order to work out agreeable financing so that the transaction may be consummated. *Id.* at 45, 16 OBR at 47–48, 474 N.E.2d at 352. The fact that plaintiff provided funds to finance the transaction is not only legal but is also encouraged by our commercial law.

As defendants assert, Ohio courts have in the past applied the so-called "close connectedness" doctrine formulated under Article 4 of the Uniform Commercial Code to the corresponding good faith and notice provisions applicable in Article 9 commercial lease transactions. See *Allis–Chalmers Credit Corp. v. Herbolt* (1984), 17 Ohio App.3d 230, 237, 17 OBR 496, 504, 479 N.E.2d 293, 301. The leading decision on this doctrine, which is an Article 4 case, is *Arcanum Natl. Bank v. Hessler* (1982), 69 Ohio St.2d 549, 23 O.O.3d 468, 433 N.E.2d 204. In that case, the court wrote in the syllabus:

"1. A transferee who takes a note with notice of a defense on the part of any person is not a holder in due course.

"2. A transferee is not a holder in due course, when, in an action by the transferee of a note against the makers, the trier of fact finds an irregularity on the face of the note which calls into question the validity of the note, the terms of the note, the ownership of the note or creates an ambiguity as to the party to pay, and there is sufficient evidence to support such finding.

"3. A transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated."

The majority opinion of the court also noted five factors that are indications of improper close connectedness:

"(1) Drafting by the transferee of forms for the transferor; (2) approval or establishment or both of the transferor's procedures by the transferee (*e.g.*, setting the interest rate, approval of a referral sales plan); (3) an independent check by the transferee on the credit of the debtor or some other direct contact between the transferee and the debtor; (4) heavy reliance by the transferor upon the transferee (*e.g.* transfer by the transferor of all or substantial part of his paper to the transferee) and; (5) common or connected ownership or manage-

ment of the transferor and transferee. * * * " *Id.* at 555, 23 O.O.3d at 472, 433 N.E.2d at 210, citing White & Summers, Uniform Commercial Code (1972) 481.

In the present case, there was absolutely no evidence of an improper close connection between plaintiff and BusinessWatch in relation to this commercial equipment lease transaction. Plaintiff did not draft the lease forms. It did not dictate terms and conditions. It was not the primary purchaser of BusinessWatch chattel paper. It had no common owners or management with BusinessWatch.

The fact that a leasing company did a credit and trade reference check on a potential debtor is expected behavior on the part of a potential secured creditor. This one action alone should not serve to pierce the holder in due course status. Indeed, it is desirable for the company assuming the risk of nonpayment to try to gauge that risk prior to the assignment of it. Moreover, the fact that plaintiff went one step further and checked to see if the equipment was actually delivered only protects the lessee against sham practices by unscrupulous vendors. It would be remarkable to hold on the one hand, as many courts have, that the close connectedness doctrine requires assignees to inquire about or scrutinize transactions that do not appear to be entirely aboveboard and then on the other hand strip the assignee of holder in due course protection when the assignee engages in this beneficial debtor-protection behavior.

Though BusinessWatch obtained plaintiff to finance the deal, defendants could have obtained their own financing company or made other financing arrangements. The fact that BusinessWatch obtained the services of the leasing company does not, as defendants contend, demonstrate a lack of good faith or close connectedness with plaintiff.

The close connectedness doctrine has primarily served to limit waiver of defense clauses in consumer as opposed to commercial contexts. 8 Hawkland, Lord & Lewis, Uniform Commercial Code Series, Article 9 (1992) 829, Section 9–206:30.[2] Plaintiff had a right to rely on the waiver of defense clause in this commercial contract and to avoid assuming any risk concerning the condition of the security system. Defendants were aware of the assignability of the lease and must be deemed to be aware of the waiver of defense clause and its consequences by virtue of reading and signing the lease.

In sum, what we have here is a typical assignment of chattel paper under Article 9 of the Uniform Commercial Code. There was some competent, credible evidence that this secured transaction was undertaken by plaintiff in good faith

---

2. Today consumers are protected against such waiver of defense clauses by the Federal Trade Commission's holder in due course regulations, Section 433.1 *et seq.*, Title 16, C.F.R.

and without notice of any claim or defense. Accordingly, defendants' first, second and third assignments of errors are without merit.

Defendants' fourth assignment of error asserts that there was insufficient evidence presented to award plaintiff "reasonable" attorney fees. Paragraph thirteen of the lease in question declared that in the event of default, the lessor shall be liable for all "collection expenses" and "reasonable attorney fees and court costs." Plaintiff attached a statement of account to its complaint that was later admitted at trial. This document claimed a sum of $1,009.71 as "20% attorney's fees." Ann Baccellieri, who engages in the collection of accounts receivable for plaintiff, said she "assumed" this twenty-percent figure was reasonable. Though defendants did not object or contest the reasonableness of this percentage or amount at trial, we think that the foregoing testimony did not constitute some competent, credible evidence to establish what constituted "reasonable" attorney fees in this case. Accordingly, the trial court erred in awarding such fees. Hence, this assignment of error is well taken.

For the foregoing reasons, defendants' first, second, and third assignments of error are overruled. Defendant's fourth assignment of error is sustained. Accordingly, the judgment of the trial court is modified to award judgment in the amount of $5,469.33, plus interest at the rate of ten percent per annum and, as so modified, is affirmed. This cause is remanded to the trial for implementation and execution of the modified judgment.

*Judgment affirmed as*
*modified and*
*cause remanded.*

PEGGY BRYANT, P.J., and WHITESIDE, J., concur.