CHASE BANK OF OHIO, Appellant and Cross–Appellee,

v.

NEALCO LEASING, INC. et al., Appellees and Cross–Appellants.

[Cite as *Chase Bank of Ohio v. Nealco Leasing, Inc.* (1993), 92 Ohio App.3d 555.]

Court of Appeals of Ohio,
Hamilton County.

Nos. C–920333, C–920370.

Decided Dec. 22, 1993.

*Graydon, Head & Ritchey, Stephen L. Black* and *Douglas R. Fauth,* for appellant and cross-appellee.

*Cohen, Todd, Kite & Stanford, Michael J. Boylen* and *Donald J. Rafferty,* for appellees and cross-appellants.

*Per Curiam.*

Chase Bank of Ohio ("Chase") appeals from the decision of the trial court granting it judgment in the amount of $79,390.50 against Cincom Systems, Inc. ("Cincom"), in an action brought to recover lease payments on computer software. In its appeal, Chase advances four assignments of error: (1) that the trial court erred by failing to award it the entire accelerated balance due under the lease agreement, (2) that the trial court erred by failing to admit into evidence the deposition testimony of Robert Skiver, (3) that the trial court erred by failing to admit into evidence the note and security agreement between Chase and the putative buyer/lessor of the software, Nealco, Inc. ("Nealco"), and (4) that the trial court erred by failing to grant prejudgment interest. We find the first and fourth assignments of error to have merit and thus reverse the judgment below.

In its cross-appeal, Cincom asserts in its three assignments of error: (1) that the trial court erred by awarding Chase judgment against it in the amount of $79,390.50, (2) that the trial court erred by failing to grant its motion to dismiss at the close of Chase's case, and (3) that the trial court erred by admitting into evidence over objection Chase's exhibit number ten, referred to as the "schedule 12 assignment document." We find none of these assignments to be well taken.

I

These appeals stem from what the parties refer to as a "leveraged lease transaction." Such a transaction is designed to advantageously affect the books of a company by allowing it to obtain the use of an asset without showing the corollary debt. To do this, the company arranges to have a third party buy the asset and then lease it to the company. In the present case, the third party was Nealco, a company headed by Robert Skiver. Nealco was a leasing corporation which had leased several "schedules" of computer equipment to Cincom under a

master lease.[1] Chase had previously provided Nealco with financing for the Cincom-bound equipment. In the transaction with which we are concerned here, Chase alleges that it loaned money to Nealco so that it could buy computer software (referred to as the Schedule 12 or Xyvision software) to lease to Cincom. According to Chase, it closed the deal after being presented: (1) a document entitled "Schedule 12" which refers to the master lease and states that the Xyvision software is being leased by Cincom from Nealco, and which is signed by Skiver and Cincom's vice president of finance and administration, Gerald Shawhan, (2) an "acceptance certificate" for the Schedule 12 software, signed by Shawhan and stating that Cincom certified that the listed software had been delivered and inspected and fully accepted by Cincom under the master lease, (3) a document entitled "acknowledgement, consent to assignment and agreement" in which Cincom agreed to Nealco assigning to Chase Bank all lease payments due under the master lease, referring to the Schedule 12 software and attaching separately a copy of Schedule 12, signed by Skiver and Shawhan, (4) a Uniform Commercial Code financing statement signed by Shawhan, attaching the Schedule 12 acceptance certificate and assigning to Chase Nealco's security interest in the software, and (5) a certificate of insurance on the Schedule 12 equipment. According to Chase, all these documents served to demonstrate to it that the Xyvision software was to be added to the master lease and financed essentially as had the other scheduled equipment. Subsequently, after disbursing the funds directly to Nealco and receiving several lease payments, Chase stopped receiving the lease payments, at which point the bank made a demand for payment on Cincom. When Cincom disavowed owing Chase any money under the assigned lease, Chase brought the action underlying these appeals for the full amount under the acceleration clause of the lease, claiming that Cincom was in default.

Cincom views the circumstances surrounding the lease very differently than Chase. Cincom claims that Chase was duped by Skiver and Nealco, whom it deems the "true villains" of this scenario, as part of a "spectacular fraud." To understand Cincom's position, one must consider a second financing arrangement involving Nealco and Cincom. The software in question was manufactured by Xyvision and was custom-ordered by Cincom for certain desktop publishing hardware. According to Cincom, prior to financing the leasing of the Xyvision software the company had decided to bring its equipment leasing in-house. To do this, it had decided that it would form a subsidiary, which was in fact a partnership called CFS Co.

---

1. The past tense is used to refer to Nealco since the company is in bankruptcy. Robert Skiver is now deceased.

Nealco was one of only two partners in CFS Co., the other being a division of Cincom, Cincom World Trade. According to Cincom, the company's decision to bring its computer equipment leasing in-house, although including Nealco, would have cut heavily into Nealco's profits, and it was this prospect that prompted Skiver to concoct his fraud upon Chase. During the time that Nealco was, according to Cincom, defrauding Chase, Nealco was also, according to Cincom, legitimately participating in the in-house leasing of the Xyvision software through its partnership with CFS Co.

As part of the arrangement between CFS Co. and Xyvision, CFS Co. was required to produce a thirty percent downpayment. According to Cincom, CFS Co. asked Nealco to advance the downpayment, which amounted to $79,300.50. Cincom maintains that Skiver used a false acceptance schedule and his close personal association with the chief commercial lending officer of Chase [2] to obtain an *unsecured* loan for the $79,300.50. Having succeeded in this gambit, Skiver, according to Cincom, sensed that he might fraudulently persuade Chase to give him the entire proceeds of the loan for the Xyvision software, using additional bogus documentation. He succeeded, according to Cincom, because he tricked Cincom's vice-president into executing a document which purported to show Cincom's agreement to Nealco assigning the lease to Chase,[3] and because Chase negligently failed to require at the closing adequate documentation that Nealco had obtained title to the Schedule 12 Xyvision software.[4]

---

**2.** The person who made the loan decision for Chase was its now former vice-president responsible for lending, Earl Lindholz. Lindholz testified that he had known Skiver socially for approximately twenty years and that the two played golf together. Lindholz stated that he had numerous contacts with Skiver up until the time of his death, and had continued such contacts even after the present controversy arose between the parties.

**3.** According to Cincom, this subterfuge was carried out by having Shawhan sign a document and then later, unbeknownst to him, adding a reference to the Schedule 12 Xyvision equipment.

**4.** There was only one attorney present at the closing. His firm had represented Nealco, Chase, and Cincom on various matters. At the time of the closing, however, the attorney was technically representing Nealco after having advised Chase that his client was seeking to borrow money and receiving word from Chase that the bank did not object on the basis of any perceived conflict, given the non-adversarial nature of the closing. The attorney testified that, according to his own checklist, proof that title to the software had passed to Nealco was required before the transaction could be closed. The attorney conceded, however, that the document he accepted as proof that title had passed was the "[e]quivalent of a payoff statement," which was not a bill of sale but "the document under which Nealco would be paying for the equipment." He testified that, under the circumstances, he accepted the document as evidence of title in Nealco, although he also stated that under principles of equity he realized that the only title to have actually vested was limited to the amount of the downpayment, $79,300.50. He stated that under the circumstances he was presuming that Nealco would pay the amounts reflected on the payoff statement and would take complete title to the software. *Id.* He further testified that he advised Chase of the limited nature of the evidence of title. *Id.*

After receiving the loan proceeds, Cincom contends, Skiver pocketed the monies, from which he then made monthly lease payments to make it appear that Cincom was in on the lease. According to Cincom, when most of the Xyvision software was ready for delivery CFS Co. financed its purchase through the New England Merchants Funding Corporation ("NEMFC"), which was the company picked by CFS Co. to finance its leasing purchases, and which subsequently assigned its interest in the transaction to the defendant-appellee, the New England Merchants Leasing Corporation ("NEMLC"). At this point Cincom contends that NEMFC reimbursed Nealco for its advancement of the downpayment. According to Cincom, once Nealco was reimbursed the downpayment, Nealco was no longer a party to the financing of the Xyvision software lease. It was through the financing arrangement involving CFS Co. and NEMLC, *not* that involving Nealco and Chase, that Chase argues it was ultimately leased the Xyvision software. It is Cincom's position that it never entered into any lease with Nealco, or agreed to an assignment of the lease to Chase, regarding the Xyvision software.

Chase, it should be noted, adamantly rejects the suggestion that Cincom was somehow an innocent player in Robert Skiver's fraud. According to Chase, Cincom "knowingly participated" with Skiver in the breach of the Nealco lease and, in effect, "used the same equipment (and the lease thereof) as collateral to borrow a second time from a different bank." As evidence of Cincom's duplicity and its awareness that it had entered into a Schedule 12 lease with Nealco through the leveraged lease transaction involving Chase, Chase points to the fact that, after the loan from Chase, Cincom and Nealco subsequently executed a document entitled "Termination Agreement," in which Nealco agreed to "release and forever discharge" Cincom from "all obligations, including further payments which are or may become due and owning [*sic* ] pursuant to Schedule # 12 to the [master lease]." This document further states that Nealco agreed to indemnify Cincom for any legal claims arising out of the "Equipment Schedule." Additionally, as evidence that Cincom acknowledged Nealco's title to the software, Chase points to a post-closing Purchase Agreement between Nealco and CFS Co. in which Nealco is described as the seller of the software to CFS Co.[5]

## II

Chase's first assignment of error asserts that the trial court erred by failing to award it the entire amount due under the acceleration clause of the lease. The trial court, as will be discussed more fully *infra,* determined that there was a

---

5. It should be noted that CFS Co. sold the tax benefit of the leveraged lease transaction to the defendant-appellee, the Bel–Wood Country Club, which explains how this party is involved in the present case.

valid lease and assignment of lease obligating Cincom to make lease payments to Chase; however, the trial court also found that Chase had been negligent in disbursing the proceeds directly to Nealco without proof that the proceeds had been paid, or would be paid to Xyvision. The trial court thus limited Chase's recovery to the $79,300.50 downpayment, *i.e.*, the amount of the proceeds actually used by Skiver toward the software. Implicit in the trial court's conclusion is that Chase should bear the loss of the balance because it negligently failed to protect its interests.

In its cross-appeal, Cincom raises what is essentially the obverse of Chase's first assignment of error, *i.e.*, Cincom asserts that the trial court erred by awarding Chase any amount under the lease. In its second assignment of error in its cross-appeal, Cincom argues that the trial court erred by failing to grant its motion to dismiss at the close of the plaintiff's case. In its third assignment of error, Cincom asserts that the trial court erred by admitting into evidence, over objection, Plaintiff's Exhibit 10, "the so-called Schedule 12 assignment document." As these four assignments of error are interwoven, we will first consider the evidentiary issue and then examine the record to resolve the issues regarding the sufficiency and weight of the evidence.

■ Cincom's evidentiary challenge to the "Schedule 12 assignment document," which is in actuality a document purporting to show Cincom's agreement to the assignment, centers on its claim that the document is not authentic. In this regard, Cincom argues that: (1) no representative of Chase was shown to have executed the document and returned it to Cincom, (2) there is no evidence that the referenced Schedule 12 was ever attached to the document at either its signing, the loan closing, or when it was identified at trial, and (3) the document is fraudulent on its face because the opening paragraphs do not refer to Schedule 12, the reference to that particular schedule being "buried in the middle of page 2." Cincom's Brief at 20.

Upon our review of the pertinent portions of the record, we agree with Chase that it laid a sufficient evidentiary foundation for the document. Most significantly, the attorney at the closing whose firm produced the document testified that the references to other lease schedules were a typographical, computer-generated error and that Schedule 12 was attached to the document at closing.[6] Shawhan testified that he executed the document.[7] Under these circumstances, we conclude that the admission of the document was within the sound discretion of the trial court, and that the record manifests no abuse of that discretion.

---

6. T.p. 84–86.

7. T.p. 247–249.

*Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 21 O.O.3d 285, 424 N.E.2d 568. Cincom's arguments assailing the legitimacy of the document go to its weight rather than its admissibility. Thus, Cincom's third assignment of error in its cross-appeal is overruled.

We turn next, then, to the assignments of error concerning the weight and sufficiency of the evidence, beginning with the findings of fact and conclusions of law of the trial court.[8]

The trial court made the following pertinent findings of fact:

"1. As of June 26, 1987, Cincom had entered into a master lease with Nealco for eleven schedules of leased equipment.

"2. In order to finance the acquisition of the Xyvision software, Cincom signed a lease schedule No. 12 to the existing master lease. Moreover, on the same date, Cincom signed an acceptance certificate for the Xyvision or 'Schedule 12' equipment.

"3. On July 27, 1987, Cincom sent to the attorney closing the transaction for the parties UCC financing statements signed by Cincom which acknowledged the existence of the lease with respect to the Schedule 12 equipment. 'The financing statements were duly recorded in favor of Nealco as lessor of the equipment to Cincom, with the lease being assigned to Chase Bank of Ohio.'

"4. The leasing transaction closed. Cincom signed a document (a) acknowledging its consent to the assignment of the lease schedule to Chase as lessor, (b) agreeing to make payments directly to Chase, and (c) agreeing not to amend, nullify, assign or terminate the lease without the prior written consent of Chase.

"5. At closing, Cincom provided Chase with a certificate of insurance listing Chase as the loss payee for the Schedule 12 equipment.

"6. When Chase bank deposited the entire loan proceeds in Nealco's checking account, Chase had no knowledge that there was any impropriety in the transaction.

"7. Unbeknownst to Chase, Nealco failed to use the loan proceeds to pay Xyvision.

"8. Without notice to Chase, Cincom and Nealco 'terminated' the lease.

---

**8.** It should be noted that the trial court put on two entries in this case, the first granting Cincom "partial judgment," meaning that Chase's recovery was limited to $79,390.50, and the second granting Chase judgment in the amount of $79,390.50. Cincom argues on appeal that Chase, because it appealed only from the latter entry, waived "any contention on appeal that it might recover more" than $79,390.50. We find this argument feckless since Chase's appeal from the entry granting it judgment of $79,390.50 clearly allows it to argue that it was entitled to a larger amount.

"9. In the course of 'refinancing' the equipment, Nealco transferred its interest in the Xyvision software to CFS Co.

"10. After the closing of the loan from Chase to Nealco, Nealco made monthly lease payments to Chase. When the payments stopped, Chase made demand on Cincom to make the payments directly to it. When Cincom refused, Chase accelerated the balance due under the lease, which totaled $210,885.56."

Additionally, the trial court drew the following conclusions of law:

"1. Nealco was the owner of the Schedule 12 Xyvision equipment on the date of the closing.

"2. Nealco had entered into a valid lease of the Schedule 12 equipment with Cincom.

"3. Cincom caused Nealco to attempt to terminate the Schedule 12 lease, but the termination was ineffective because it was made without the knowledge and consent of Chase, to whom Nealco had already assigned the lease.

"4. Cincom owes Chase the rent due under Schedule 12 of the lease.

"5. Chase was negligent in advancing the loan proceeds to Nealco without assuring that Xyvision had been paid or would be paid from the loan proceeds.

"6. 'By reason of its negligence,' Chase can only recover on the lease to the extent of its funds actually applied to the purchase price, *i.e.*, the downpayment."

We shall deal first with Cincom's first and second assignments of error in its cross-appeal because they directly challenge the court's factual and legal findings. According to Cincom, the evidence shows that, contrary to the trial court's finding, Skiver, as part of his fraud, never used the money borrowed from Chase to purchase the computer software. According to Cincom's version of events, Nealco obtained an unsecured loan from Chase, put a payment down on the Xyvision software, and was subsequently reimbursed through NEMLC. Cincom maintains that Nealco never obtained title to the software and never leased the equipment. Indeed, Cincom disputes that the downpayment can be traced to the Chase loan proceeds. Furthermore, according to Cincom, the document purporting to be an agreement to the assignment of the Nealco–Cincom lease to Chase was obtained as a result of Skiver defrauding Shawhan into signing a document which was later doctored.

Based upon its alternative view of the facts, Cincom contends that the assignment of the Nealco–Cincom lease to Chase is ineffective since the assignment was a unilateral contract dependent upon Nealco's performing under the lease, which never occurred. As stated by Cincom in its response brief: "Since Cincom has no obligation to pay Nealco under a lease that was never performed, it can have no obligation to Chase on the basis of the alleged assignment of such a

non-existent obligation." Alternatively, Cincom argues that, even if the $79,-300.50 used by Skiver as a downpayment on the Xyvision should be considered partial consideration on the lease supplied by Chase, such partial performance does not rise to the level of substantial performance and cannot obligate Cincom to fully perform under the lease.

As can be readily seen, for this court to accept Cincom's arguments, which are essentially those that it made unsuccessfully below to the trial court, we would have to make several affirmative findings regarding the motives and machinations of Skiver and Nealco, finding fraud where the trial court did not. It is interesting in this regard that nowhere in its brief on this issue does Cincom address the pertinent standard for our review of the trial court's factual findings. It is axiomatic that this court does not sit as a trier of fact. Rather, "on the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. In a civil case, "[j]udgments supported by some competent, credible evidence going to all of the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

The trial court, as factfinder, was entitled to reject Cincom's theory and evidence respecting the fraudulent nature and false import of the acceptance certificate and the document entitled Schedule 12. By omitting any reference to fraud in its findings of fact and conclusions of law regarding these documents as well as the agreement to the assignment of the lease, the trial court clearly did not find them fraudulent. Furthermore, the trial court was entitled to find that Cincom prepared the acceptance certificate and the schedule 12 addendum "[i]n order to finance the acquisition of the Xyvision software * * *." This being so, there was sufficient evidence to support the trial court's findings that the purchase and lease of the Xyvision software was accomplished by Nealco and Cincom as a schedule under the master lease, and that Cincom, by agreeing to the assignment of the lease to Chase as part of the document package which was given to Chase to secure financing for the acquisition of the Xyvision software, became obligated to Chase under the terms of the assignment agreement. Furthermore, we find sufficient evidence to support the trial court's conclusion that Cincom and Nealco entered into an agreement to terminate a valid existing lease which had been assigned to Chase, and in essence set out to "refinance" the equipment through a second leveraged lease transaction.

With particular regard to Cincom's argument that "Chase has no equitable or legal claim against Cincom," we wholly disagree. By acceptance of the trial

court's findings, it is clear that Cincom entered into a lease with Nealco and that Nealco thereafter assigned the lease to Chase. Furthermore, again based on the trial court's findings, Cincom, the obligor, *agreed in writing* to the assignment, putting its signature on a document entitled "Acknowledgement, Consent To Assignment and Agreement."

Although the general rule is that Chase as the assignee has no better rights than Nealco, its assignor, see *R.C. 1309.37*, the document which Cincom signed contains language which unmistakably constitutes a waiver-of-defense clause. To fully convey the breadth of this clause, we quote it at length:

"Lessee [Cincom] agrees: (i) to remit and deliver all payments (including rent) due under the Lease (or a sum of money equal in amount to such payments (and rent) ('Monies') directly to the Assignee [Chase] in immediately available funds by check or Federal Reserve System wire transfer to Chase Bank of Ohio on or before the date such payment is due, without abatement, reduction, counterclaim, offset, interruption or deferment, notwithstanding any claims, rights or defenses which Lessee may otherwise have in respect of (a) any default or breach of any obligation by the Lessor under the Lease or otherwise, (b) the inability of Lessee to use the equipment, (c) any claims of any nature against the manufacturer of the Equipment, the Assignee, or any other party, (d) the bankruptcy or insolvency of the Lessor or the disaffirmation or rejection of the Lease by the trustee in bankruptcy (or similar party) for the Lessor or (e) any other event or circumstance whether or not similar to any of the foregoing; (ii) to deliver copies of all notices, communications and documents given or made by Lessee pursuant to the Lease to Assignee at its address shown below; and (iii) the Assignee shall be entitled to the full benefit of the indemnifications of Lessee pursuant to Section 9 of the Lease.

"Lessee further agrees that: (1) it shall not enter into any agreement amending, modifying, assigning or terminating the Lease without the prior written consent of Assignee; (ii) any such attempted agreement to amend, modify, assign or terminate the Lease without such consent shall be void; (iii) only the Assignee shall have the power to give any consents or waivers or make any requests under or with respect to the Lease and (iv) if any Event of Default occurs under the Lease, the Assignee can exercise all remedies available thereunder in place of the Lessor." [9]

---

**9.** That this language was intended to mean what it says is underscored by the testimony of the attorney at the closing who was the one who prepared the document and who testified that the "[p]urpose of this specific form is to assure the lender that the equipment is in hand where it's located, and commit upon request to make payments directly to the bank *without right of setoff, without any other defenses.*" (Emphasis added.)

As noted by one authority, such waiver-of-defense clauses, when valid, give to the assignee rights "which resemble those of the holder in due course" and have been sustained in the majority of courts while finding further support in the Uniform Commercial Code.[10]  Calamari & Perillo, Contracts (2 Ed.1977) 375, Section 10–5.  In this regard, UCC 9–206, and its analog in the Ohio Revised Code (R.C. 1309.17[A] ), specifically validate such waiver-of-defense clauses, providing that "an agreement by a * * * lessee that he will not assert against an assignee any claim or defense which he may have against the * * * lessor is enforceable by an assignee who takes his assignment for value, in good faith, and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under sections 1301.01 to 1303.78, inclusive of the Revised Code."  The Official Comment makes clear the "same rules are made applicable to leases as to security agreements, whether or not the lease is intended as security."  R.C. 1309.17, Official Comment 1.

A similar analysis, applying the principles of R.C. 1309.17 to the assignment of a commercial equipment lease, was employed recently by the Tenth District Court of Appeals in *Karmich Invest. Group, Inc. v. W.M.R. Restaurant Corp.* (1993), 86 Ohio App.3d 479, 621 N.E.2d 561.  Therein the court dismissed the defendant's argument that the plaintiff, a leasing company seeking to assert a waiver-of-defense clause in an assigned lease, was too heavily involved, or "closely connected," to avoid all defenses except those that are good against a holder in due course under R.C. 1303.01 to 1303.78.  The Tenth District stated:

"As the court explained in *Konicki v. Salvaco, Inc.* (1984), 16 Ohio App.3d 40, 16 OBR 43, 474 N.E.2d 347, leasing companies frequently act as middlemen between the vendor and the purchaser of goods.  In this capacity, the leasing company provides resources in order to work out agreeable financing so that the transaction may be consummated. *Id.* at 45, 16 OBR at 47–48, 474 N.E.2d at 352. The fact that plaintiff provided funds to finance the transaction is not only legal but also encouraged by our commercial law." *Id.*, 86 Ohio App.3d at 484, 621 N.E.2d at 564.

Similar to the leasing company in *Karmich,* Chase provided the resources to finance the leveraged lease in the case *sub judice,* as it had several times in the past for the benefit of both Nealco and Cincom.  Clearly, Chase gave value for the assignment when it provided the financing.  Furthermore, there is no basis in the trial court's findings to conclude that it did not take the assignment in good

---

**10.**  For a discussion of the interplay between the various provisions of the Uniform Commercial Code governing assignments and the common law, see Calamari & Perillo, *infra,* at Chapter 18, Section 18–4.

faith. As noted by the court in *Karmich,* the leading case on the issue of good faith is *Arcanum Natl. Bank v. Hessler* (1982), 69 Ohio St.2d 549, 23 O.O.3d 468, 433 N.E.2d 204, in which the court wrote in the syllabus:

"1. A transferee who takes a note with notice of a defense on the part of any person is not a holder in due course.

"2. A transferee is not a holder in due course when, in an action by the transferee of a note against the makers, the trier of fact finds an irregularity on the face of the note which calls into question the validity of the note, the terms of the note, the ownership of the note or creates an ambiguity as to the party to pay, and there is sufficient evidence to support such a finding.

"3. A transferee does not take an instrument in good faith and is therefore not a holder in due course when there are sufficient facts to indicate the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated." See, also, R.C. 1303.33(A)(1).

Though Cincom argued vigorously below and maintains steadfastly on appeal that the document purporting to show its agreement to the assignment of the lease involving the Schedule 12 software was irregular on its face, the trial court, which had before it testimony from the attorney present at the closing which explained away the alleged irregularity, did not make any findings which support Cincom's argument. Indeed, the trial court specifically found that when Chase deposited the loan proceeds in Nealco's checking account, Chase had *no* knowledge of any irregularity in the financing transaction.

The only defense against a holder in due course which may have been of avail to Cincom was "real" or "substantial" fraud under R.C. 1303.34(B)(3). The trial court, however, manifestly rejected this defense on its merits when it failed to make any finding of fraud. Significantly, the Official Comment to R.C. 1303.34 specifically states that nondelivery, *i.e.,* Cincom's defense of failure of consideration, is not a defense assertable against a holder in due course. R.C. 1303.34, Official Comment 3.

■ Given the fact that the transaction herein was not a consumer transaction, the trial court's finding that Chase had no notice of any irregularity in the financing transaction when it disbursed the loan proceeds, and the lack of any finding of unconscionability in the terms of the assignment agreement or any finding to otherwise support the conclusion that Chase did not take the assignment in good faith, we find no legal impediment to the validity of the waiver-of-defense clause in the document wherein Cincom agreed to the lease assignment involving the Schedule 12 software. In sum, we hold the waiver-of-defense clause in the assignment agreement gave Chase rights against Cincom, the obligor,

which were tantamount to those of a holder in due course. Furthermore, although the trial court did not choose to decide the case on this basis, in view of the trial court's finding that Nealco and Chase deliberately terminated the lease, Chase's argument that Cincom should be equitably estopped from asserting that Nealco failed to provide the called-for consideration is particularly cogent.

Cincom's first and second assignments of error in its cross-appeal are, therefore, overruled.

■ With regard to its first assignment of error, Chase advances several arguments for its assertion that it should be entitled to the full accelerated amount under the lease. First, Chase emphasizes the documentation upon which the loan was granted, and upon which Chase argues that it had a right to rely. Second, Chase argues that there is no basis in the law for the trial court's ruling that what it described as Chase's "negligence," meaning its failure to follow the industry practice of distributing the loan proceeds directly to the vendor of the equipment, reduces the amount of damages recoverable under the lease. Not only does Chase reject this as a legal proposition, but factually it disputes that its "negligence" in this regard was the cause of its damages, which it attributes directly to Nealco and Cincom conspiring to break the lease. Finally, Chase argues that Cincom is equitably estopped from now asserting that the lease fails for want of consideration because Cincom acknowledged in the assignment of the lease and acceptance certificate that the equipment had been delivered.

It is indisputable from the evidence that Chase, specifically Eric Lindholz, disbursed the loan proceeds to Skiver contrary to the advice of counsel and industry practice.[11] Normally, in a leveraged lease transaction, the bank loans money directly to the vendor (in this case, Xyvision) to ensure that the money is spent for the goods which are supposed to be leased. This further ensures that the bank will be the first security-interest holder. In his defense, Lindholz stated that he did not take the normal precautions because of his familiarity with the principals and because of his past dealings with Nealco under the master lease with Cincom. Lindholz testified he had dealt with Skiver and Nealco on previous loans and there had never before been any problem with repayment.

The trial court found Chase "negligent," and, without expressing our own opinion, we find sufficient evidence to support this conclusion. We disagree with the trial court, however, as to the legal effect of Chase's negligence. Without discussion, the trial court concluded that Chase's negligence affected its right to enforce the terms of the lease as assignee. In effect, the trial court set off against what Chase was due under the lease the amount of the loan which Skiver

---

11. Chase on appeal concedes that its failure to pay the vendor directly was not in conformity with standard practice. Chase Brief at 8.

was able to pocket as a result of Chase's failure to follow industry practice in protecting itself against a dishonest borrower.

■ We hold that the trial court erred by effecting this setoff. It is clear that there is no legal basis upon which to hold that the nonbreaching party's negligence reduces its damage in a contract action. In this regard it is well settled that comparative negligence, contributory negligence, or assumption of the risk are not defenses in contract. See *Becker v. BancOhio Natl. Bank* (1985), 17 Ohio St.3d 158, 17 OBR 360, 478 N.E.2d 776; R.C. 2315.19. We hold, therefore, that the trial court erred by reducing Chase's damages on the basis of its own negligence and thus find Chase's first assignment of error to be well taken.[12]

### III

■ In its second assignment of error, Chase asserts that the trial court erred by refusing to admit into evidence the deposition testimony of Skiver under Evid.R. 804(B)(1). With regard to the former testimony of an unavailable witness, that rule provides an exception to the hearsay rule as follows:

"(1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had a opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given at a preliminary hearing must satisfy the right of confrontation and exhibit indicia of reliability."

Chase argues that the requirements of the rule are satisfied by the deposition testimony of Skiver because (1) his death rendered him "unavailable" within the meaning of the rule, (2) his deposition was taken in connection with the matter *sub judice* and in accordance with law, and (3) Cincom had the motive and opportunity to develop the testimony by cross-examination. Cincom, on the other hand, argues that the trial court properly excluded the deposition testimony of Skiver because the record of the deposition demonstrates that Cincom did not

---

**12.** Again it bears emphasis that the trial court made no finding of unconscionability and the setoff it effected appears to have been made solely on the basis of what it perceived to be Chase's negligence. Compare *Driggs v. Credit Alliance Corp.* (N.D.Ohio 1984), 591 F.Supp. 1221, in which the trial court found the waiver-of-defense clause in a note enforceable but nonetheless limited the plaintiff's full amount of damages recoverable under the note because a third party's fraud had rendered it "unconscionable" that the plaintiff receive all of the damages to which it was contractually entitled, since such would have allowed the plaintiff to unfairly benefit by the fraud. In the instant case, not only is there no finding of unconscionability but the damages which Chase seeks are compensatory and do not constitute a windfall.

complete its questioning of Skiver and was intending to call him back for further examination. "Under these circumstances, where it is patently clear that a party has a number of additional, crucial areas into which it wishes to inquire, it cannot be said that party had an ample opportunity to cross-examine the subsequently unavailable witness." Cincom Response Brief at 13. Further, Cincom argues that, even if Skiver's deposition testimony was improperly excluded, the exclusion did not affect a substantial right and was harmless error since the record contains testimony from other witnesses as to every issue upon which Chase has indicated Skiver's testimony would be probative.

Given that Cincom has labeled Skiver the "true villain" in a "spectacular fraud" in which Chase was duped out of over $200,000, we find it slightly incongruous that Cincom would also argue that the exclusion of the Skiver testimony, even if improper, did not impinge upon a substantial right.[13] However, in light of our resolution of Chase's first assignment of error, rendering harmless any error with respect to the exclusion of the Skiver testimony, we find Chase's second assignment of error to be moot under App.R. 12(A)(1)(c).

## IV

In its third assignment of error, Chase asserts that the trial court erred by not admitting into evidence the note and the security agreement between Chase and Nealco. Again, any error with respect to the exclusion of this evidence is rendered harmless by our resolution of Chase's first assignment of error and is therefore found to be moot under App.R. 12(A)(1)(c).

## V

In its fourth assignment of error, Chase asserts that the trial court erred by failing to grant it prejudgment interest. In this regard, Chase argues that the amount of lease payments due under the lease, once accelerated and owing, constituted a liquidated sum of money for which prejudgment interest should have been granted under R.C. 1343.03(A). Cincom responds that the denial of prejudgment interest was a proper exercise of the trial court's discretion and that the trial court's award of damages, $79,300.50, was not based on any contract but,

---

13. In its brief, Chase argues that the Skiver deposition shows, *inter alia*, that Cincom knowingly entered into the "Nealco Lease Transaction" after review of the documents by its legal department, and that in late 1987, with the aid of Cincom's legal department, the lease of the Schedule 12 equipment was terminated and the equipment transferred from Nealco to CFS Co. so that CFS Co. could effect yet another sale of the equipment to Bel–Wood Country, Club, Inc. According to Chase, Skiver's deposition testimony "provided evidence that Cincom was not an innocent victim of Nealco's misdeeds, but an active perpetrator of the lease termination which caused Chase Bank's loss."

rather, a theory of unjust enrichment. We disagree based upon our previous holding that the trial court erred in failing to award Chase the full amount due under the acceleration clause of the lease, a sum which is clearly liquidated and payable upon a contract. Thus, Chase's fourth assignment has merit.

## VI

Accordingly, the judgment below is reversed in the appeal numbered C–920333 and this cause is remanded for the trial court to enter judgment in Chase's favor for the full amount of the money due under the acceleration clause of the lease, together with prejudgment interest from the date upon which the sum became due. As it is appealed in No. C–920370, the judgment is affirmed.

*Judgment accordingly.*

SHANNON, P.J., GORMAN and HILDEBRANDT, JJ., concur.